Robert KRAUSE, et al., Plaintiffs,

v.

**CHERRY HILL FIRE DISTRICT 13, Defendant.**

Civil Action No. 96–1269.

United States District Court, D. New Jersey.

June 30, 1997.

Jerald R. Cureton, Renee C. Vidal, Cureton, Caplan & Clark, P.C., Mount Laurel, NJ, for Plaintiffs.

Steven S. Glickman, Ruderman & Glickman, P.C., Newark, NJ, for Defendant.

## OPINION

ORLOFSKY, District Judge:

Plaintiffs, all members or former members of fire companies located in Cherry Hill, New Jersey, bring this suit against Cherry Hill Fire District 13 ("District 13") presently the exclusive provider of fire protection and fire safety services in the Township of Cherry Hill, New Jersey. Plaintiffs allege violations of the federal Fair Labor Standards Act ("FLSA"),[1] violations of certain New Jersey statutes governing public employment,[2] and common law breach of contract. Jurisdiction over plaintiffs' claims under the FLSA is based upon 28 U.S.C. § 1331. Plaintiffs invoke this court's Supplemental Jurisdiction over their state law causes of action. *See* 28 U.S.C. § 1367(a).

Plaintiffs move for summary judgment pursuant to Fed.R.Civ.P. 56(a) on their claims under the FLSA and the New Jersey public employment statutes. Defendant cross-moves for summary judgment pursuant to Fed.R.Civ.P. 56(b) on all of plaintiffs' claims. These motions and cross-motions require this court to decide an issue of apparent first impression in this district, namely, whether the plaintiffs are "employees" within the meaning of the Fair Labor Standards Act, or whether these firefighters fit within the exception to the Act for "volunteers."[3]

---

1. 29 U.S.C. §§ 201–219.

2. N.J. Stat. Ann. §§ 40A:14–19, 14–60, 14–64 and 14–65.

3. Whether a particular situation is an employment relationship under the FLSA is a question of law which may appropriately be resolved on a

The federal question presented by these motions is two-fold. Did District 13 establish an "employee," as opposed to a "volunteer" relationship with its part-time firefighters, including the plaintiffs, and, if such a relationship existed, did District 13 succeed in returning these "employees" to "volunteer" status at the time it chose to reduce the compensation paid to some firefighters for certain shifts to a rate below the prevailing minimum wage? Because an employee relationship was established between District 13 and the plaintiffs, and because such a relationship cannot be unilaterally altered by an employer's decision purporting to return some employees to "volunteer" status, the plaintiff's motion will be granted, in part. Because plaintiffs' state law claim contained in counts two through four of their complaint share no common nucleus of operative fact with their FLSA claim, and because those state law claims substantially predominate over the FLSA claim, this court will not exercise supplemental jurisdiction over those claims. Therefore, plaintiffs' state law claims will be dismissed without prejudice, and defendant's cross-motion for summary judgment on those claims will be dismissed as moot.

## I. Facts [4]

On July 12, 1993, pursuant to Ordinance number 93–27, the Township of Cherry Hill, New Jersey, created Cherry Hill Fire District 13, the defendant in this action, thereby consolidating, and eliminating, what had been six independent fire districts within the Township. On January 1, 1994, after a period of transition, District 13 became the sole entity responsible for fire protection and fire safety in the Township.

District 13, like its predecessors, relies on a staff composed both of career firefighters and non-career firefighters. The career firefighters receive remuneration and benefits in accordance with a collective bargaining agreement between the Township and the International Association of Firefighters. The plaintiffs in this action, all non-career firefighters, are not now, and never have been covered by that collective bargaining agreement.

District 13 staffs some firehouses with career firefighters 24 hours per day. Other firehouses are staffed by a combination of career and non-career firefighters. Career firefighters may work as much as a ten-hour shift (7 a.m. to 5 p.m.) at some firehouses. As of January 1, 1994, non-career firefighters staffed some firehouses on "duty-crew" shifts (5 p.m. to 11 p.m. weekdays, and 7 a.m. to 3 p.m., or 3 p.m. to 11 p.m., on weekends). Non-career firefighters also staffed some firehouses from 11 p.m. to 7 a.m., the so-called "sleep-in" shift.

Between January 1, 1994, and August, 7, 1995, District 13 compensated non-career firefighters at a rate of $ 8.00 per hour, and non-career officers at a rate of $ 9.00 per hour, for all "duty crew" shifts. Non-career firefighters and officers received $ 5.05 per hour for "sleep-in" shifts.

After August 7, 1995, District 13 eliminated the weekday "duty crew" shifts for non-career firefighters. District 13 decided to staff these former "duty crew" shifts with a combination of career firefighters and, after August 7, 1995, firefighters in the newly created position of "Minimum Staffer," a part-time position paying $8.00 per hour. The "Minimum Staffers" were selected from among non-career firefighters who applied for the newly created position. None of the plaintiffs is a "Minimum Staffer." At the same time, defendant began compensating the remaining non-career firefighters, including the plaintiffs, at a rate of $20.00 per eight hour shift for the remaining "sleep-in" shifts.

District 13 requires all career and non-career firefighters to attend monthly drills, to demonstrate successful completion of a Firefighter I course, at a minimum, and to maintain the Firefighter I certificate. In addition, all firefighters must be certified in Crash Injury Management, Infectious Diseases, Cardio–Pulmonary Resuscitation,

---

motion for summary judgment. *See Fegley v. Higgins,* 19 F.3d 1126 (6th Cir.1994).

**4.** Unless otherwise noted, the undisputed facts set forth herein are recorded in a joint stipulation executed by counsel on May 5, 1997.

Self–Contained Breathing Apparatus, and Right to Know.

## II. Standard for Summary Judgment

On a motion for summary judgment, this court is required to view the underlying facts and all reasonable inferences drawn from those facts in the light most favorable to the party opposing the motion. *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995) (citation omitted); *see also Helen L. v. DiDario,* 46 F.3d 325, 329 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26, (1995); *Valhal Corp. v. Sullivan Assocs., Inc.,* 44 F.3d 195, 200 (3d Cir.1995); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

Summary judgment should be granted only if a court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 n. 10, 106 S.Ct. 1348, 1355–56 n. 10, 89 L.Ed.2d 538 (1986). Once the movant has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed. R.Civ.P. 56(e)) (emphasis added in *Matsushita* ). The non-movant must present concrete evidence supporting each essential element of its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The question for this court, then, is whether the parties, in opposing the motion and cross-motion, have presented sufficient evidence to create a dispute regarding a genuine issue of material fact. *Gottshall v. Consolidated Rail Corp.,* 56 F.3d 530 (3d Cir. 1995); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1381 (3d Cir.1991). "Facts that could alter the outcome are 'material', and disputes are 'gen-

uine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted).

## III. Discussion

### A. Fair Labor Standards Act

Plaintiffs contend that District 13 violated the minimum wage provisions of the FLSA when it adopted a $ 20.00 reimbursement for an eight-hour "sleep-in" shift. The FLSA provides that:

> Every employer shall pay to each of his employees who in any workweek is ... employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
>
> > except as otherwise provided in this section, not less than $ 4.25 an hour during the period ending September 30, 1996, not less than $ 4.75 an hour during the year beginning on October 1, 1996, and not less than $ 5.15 an hour beginning September 1, 1997.

29 U.S.C. § 206(a). In order for an enterprise to be "engaged in commerce," within the meaning of the FLSA, it is sufficient that the enterprise utilizes equipment or supplies which have traveled in interstate commerce. 29 U.S.C. § 203(s). The parties do not dispute that the Cherry Hill firefighters, unless otherwise excluded, are covered by the FLSA.

However, the FLSA further provides, in the definition of "employee":

> The term "employee" does not include any individual who volunteers to perform services for a public agency which is a State, a political subdivision of a State, or an interstate governmental agency, if—
>
> > (i) the individual receives no compensation or is paid expenses, reasonable benefits, or a nominal fee to perform the services for which the individual volunteered; and
> >
> > (ii) such services are not the same type of services which the individual is

employed to perform for such public agency.

29 U.S.C. § 203(e)(4)(A). Thus, the Cherry Hill firefighters would be exempt from the minimum wage provisions of the FLSA if they were "volunteers," rather than "employees," within the meaning of the Act. In addressing this distinction, this court must bear in mind that cases interpreting the FLSA have established the twin principles that the Act is a remedial statute which "must not be interpreted or applied in a narrow, grudging manner," *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local,* 321 U.S. 590, 597, 64 S.Ct. 698, 703, 88 L.Ed. 949 (1944), and that exemptions from FLSA coverage "are to be narrowly construed against the employers seeking to assert them," *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960). *See also Reich v. New York,* 3 F.3d 581, 586 (2d Cir.1993); *Nichols v. Hurley,* 921 F.2d 1101, 1103 (10th Cir.1990).

### 1. The "Economic Realities" Test

To aid this court's analysis, the parties have extensively briefed the "economic realities" test, which they agree provides the traditional framework for determining when a worker is an employee within the meaning of the FLSA.

The FLSA contains an expansive definition of the verb "to employ," providing that it "includes to suffer or permit to work." 29 U.S.C.A. § 203(g). *See also Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 1350, 117 L.Ed.2d 581 (1992). It is well-settled that this definition extends "the meaning of 'employee' to cover some individuals who would not qualify as such under a strict application of traditional agency law principles." *Id.; see also Rutherford Food Corp., v. McComb,* 331 U.S. 722, 728, 67 S.Ct. 1473, 1475–76, 91 L.Ed. 1772 (1947). Accordingly, courts interpreting the FLSA avoid common law classifications, choosing instead to apply a test of the "economic realities" of the relationship in question. Under this test, "the determination of the employment relationship does not depend on isolated factors but rather upon the 'circumstances of the whole activity.'" *Martin v. Selker Bros., Inc.,* 949 F.2d 1286, 1293 (3d Cir.1991) (quoting *Rutherford Food,* 331 U.S. at 730, 67 S.Ct. at 1477).[5]

In order to determine whether an FLSA employment relationship exists using the "economic realities" test, courts in this Circuit consider the following six factors:

1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* (citations omitted). "[N]either the presence nor the absence of any particular factor is dispositive." *Id.*

Notably, the Third Circuit admonishes district courts in this Circuit to "consider whether, as a matter of economic reality, the individuals 'are dependent upon the business to which they render service.'" *Donovan v. DialAmerica Mktg., Inc.,* 757 F.2d 1376, 1382 (3d Cir.1985) (quoting *Donovan v. Sureway Cleaners,* 656 F.2d 1368, 1370 (9th Cir.1981)).

Unfortunately, the six-part "economic realities" test offers little guidance in this case. The test is best suited to determine whether, as a matter of economic reality, an individual is in business for himself or herself as an independent contractor, or is an employee of another. The "economic realities"

---

5. In *Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985), the Secretary brought suit against a nonprofit religious foundation which derived its income entirely from the operation of commercial businesses staffed by its converts. The staff members who testified at trial asserted that they were "volunteers," although they were entirely dependent on the Foundation. The Supreme Court rejected even the testimony of the workers themselves, noting that the test of employment is one of "economic reality." *Id.* at 301, 105 S.Ct. at 1961.

test is of limited utility in determining whether an individual is an "employee," as opposed to a "volunteer."

For example, the degree of control exercised by a putative employer is meaningful in determining whether an individual is an independent contractor because one anticipates that an independent contractor exercises significant, although not absolute control over its own activities. No such expectation exists for volunteers. An individual may volunteer his or her services to an organization, and yet succumb completely to the dictates of the organization in matters of scheduling and assignments. Indeed, a volunteer may work alongside an employee, performing the same task, without losing his or her volunteer status. Put another way, a volunteer, unlike an independent contractor, need not expect to control his or her activities in relation to the services performed.[6]

Similarly, whether the profit or loss belongs to the putative employer, or to the individual, is meaningless in the case of a volunteer, who expects no profit at all. Furthermore, it is likely, where volunteers are concerned, that the putative employer may, as in this case, be a non-profit organization. Likewise, volunteers make no investment in facilities, nor could they be expected to do so.

The degree of specialized skill required of the individual performing the service, is indicative of an independent contractor status, when that skill exceeds, or differs significantly from the skills the putative employer normally seeks in its employees. However, the fact that a "volunteer" firefighter, like a part-time paid firefighter, must maintain various certifications, does not illuminate any distinction in status between the volunteer and the employee.

The two remaining factors, of the six set forth in *Selker Brothers* and *DialAmerica,* are potentially helpful in this context. Both of them lend aid to plaintiffs' position. The permanency of these plaintiffs is demonstrated by the fact that each has worked continu-

ously, if intermittently, for District 13 since defendant took over all fire protection and fire safety services for the Township of Cherry Hill in 1994. None, as far the record reveals, has served as a firefighter for any other organization during this time period. In addition, it is unquestionably the primary role of District 13 to provide fire protection services. As firefighters, therefore, plaintiffs services are an integral part of the work performed by District 13.

■ Finally, the plaintiffs have demonstrated their "economic dependence" upon District 13. In this regard, it is irrelevant that many, though not all of the plaintiffs had other gainful employment during the time periods at issue in this case.

> The economic-dependence aspect of the ["economic realities"] test does not concern whether the workers at issue depend on the money they earn for obtaining the necessities of life.... Rather, it examines whether the workers are dependent on a particular business or organization for their continued employment.

*DialAmerica,* 757 F.2d at 1385 (citations omitted). In a sense, this inquiry is related to the question of "permanency" in the relationship between the worker and the putative employer. A worker who has an "impermanent" relationship, is also likely to be a worker with numerous options for employment in the particular field at issue, and therefore, not economically dependent on a single employer.

Consideration of the relevant factors of the "economic realities" test leads to the conclusion that the plaintiffs were employees of District 13. Perhaps more important than any of these factors, however, in analyzing whether these plaintiffs are "employees" or "volunteers," is the definitional scope of the FLSA. Recent developments in constitutional law, have impacted upon this analysis.

---

**6.** Defendants contend, as evidence of lack of control, that no plaintiff was required to complete an employment application. It is not clear how the absence of an employment application, demonstrates the absence of an employment relation-

ship. *See Haavistola v. Community Fire Co.,* 6 F.3d 211, 222 (4th Cir.1993) (district court erred in concluding that "because [the plaintiff] was not conscripted into service with the Fire Company, she could not be its employee.").

### 2. The Definition of a "Volunteer"

In 1985, in the wake of *Garcia v San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985),[7] Congress passed amendments to the FLSA intended to create certain exclusions for employees of state and local governments. *Fair Labor Standards Amendments of 1985*, Pub.L. No. 99–150, 99 Stat. 790 (1985). It was the intent: of Congress "to make clear that persons performing volunteer services for state and local governments should not be regarded as 'employees' under the statute." S.Rep. No. 99–159, at 14 (1985), *reprinted in* 1985 U.S.C.C.A.N. 651, 662. The portion of the amendments relevant to these motions is found at 29 U.S.C. § 203(e)(4)(A).[8] What Congress failed to make clear, however, is when a person is a "volunteer," and when he or she is an "employee." It was left to the Secretary of Labor to issue regulations in this area.

The regulation defining the term "volunteer" for purposes of the FLSA, provides, in part:

> An individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered, is considered to be a volunteer during such hours.

29 C.F.R. § 553.101(a) (1996). This definition contains two requirements: (1) a civic, charitable, or humanitarian reason; and, (2) the absence of an expectation of, or actual compensation for services rendered.

As to the first part, it is clear that anyone who is willing to undertake the dangerous job of a firefighter, must be, at least to a considerable degree, motivated by an altruistic sense of civic responsibility. As the New Jersey Supreme Court has observed, firefighters, even when paid for their services, routinely "confront crises and allay dangers created by an uncircumspect citizenry, a circumstance that serves to distinguish firefighters ... from most other public employees." *Berko v. Freda,* 93 N.J. 81, 86, 459 A.2d 663 (1983).

In view of this fact, the DOL regulations must surely require more than a generalized public spiritedness on the part of the individual concerned, or that the organization for which the individual performs services be the type which is involved in a "civic, charitable, or humanitarian" mission. This was the conclusion of the court in *Rodriguez v. Township of Holiday Lakes,* 866 F.Supp. 1012 (S.D.Tex.1994). After minimizing plaintiff's contention that he had been "coerced" into donating his services,[9] the *Rodriguez* court nevertheless concluded that an unpaid patrol officer was an "employee" of the defendant municipality, rather than a "volunteer," for purposes of the exemption from the minimum wage provisions of the FLSA. *Id.* at 1019. A critical factor in the court's decision was its finding that the plaintiff patrol officer did not perform the services in question for "civic, charitable, or humanitarian" reasons, but, rather, performed them in order to obtain additional employment as a road-construction flagman in a neighboring county that required its flagmen to be police officers. *Id.* Although the court observed that the plaintiff had chosen a "strikingly inefficient" manner in which to make a living, *id.* at 1018, it nevertheless concluded that 29 C.F.R. § 553.101(a) clearly requires the individual in question to be motivated by "civic, charitable, or humanitarian reasons." *Id.* at 1019. However improbable, Rodriguez's explanation of his motivations was plausible. The summary judgment record before this court, however, does not provide a clear statement from each plaintiff, of a similar pecuniary motive.

---

7. *Garcia* explicitly overruled *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which had held that the Commerce Clause did not empower Congress to enforce the minimum wage and overtime provisions of the FLSA against the States, when the States acted "in areas of traditional government function," such as providing police and fire protection. *Id.* at 852, 96 S.Ct. at 2474.

8. For the relevant text, see *supra,* page 273–74.

9. Department of Labor regulations provide: "Individuals shall be considered volunteers only where their services are offered freely and without coercion, direct or implied, from an employer." 29 C.F.R. § 553.101(c).

The ·plaintiffs' motivations, however, are only relevant if the plaintiffs have undertaken to perform firefighting services "without promise, expectation or receipt of compensation." It is undisputed that the plaintiffs received compensation, at a minimum rate of $ 5.05 per hour, and a maximum rate of $ 9.00 per hour, from January 1, 1994 to August 7, 1995. On May 5, 1995, more than seventeen months after District 13 took over all fire services in the Township of Cherry Hill, Michael A. Saraceni, Deputy Chief of Administration for District 13 ("Saraceni"), wrote to Richard C. Richards, District Director of the Wage and Hour Division of the Department of Labor ("Richards"), requesting an Opinion Letter regarding District 13's "compliancy" with the FLSA. Glickman Aff., exhibit 20. On May 16, 1995, Richards replied that the only "potential FLSA problem" he could identify from the facts related in Saraceni's letter was: "the payment of an hourly rate to 'volunteers' to provide station staffing." Glickman Aff., exhibit 21. Richards went on to note that:

[I]ndividuals would not lose their "volunteer" status if they are [sic] furnished expenses, reasonable benefits or are [sic] paid a nominal fee (such as your $ 4.00 per response from home). On the other hand, your practice of paying $ 8.00/$ 9.00 an hour to staff a station is more than a nominal fee and is sufficient to create an employment relationship and thus destroy their "volunteer" status. Once the individual becomes an "employee", [sic] he/she is then prohibited from volunteering the same type of services to the same employer.

*Id.* Richards concluded his letter with the caveat that his was an advisory opinion only, and "should not be relied upon as an official position of this agency." *id.* Despite this clear instruction, on July 21, 1995, Saraceni circulated a memorandum to "All Part-time/volunteer Personnel," which begins:

"Due to a recent determination by the United States Department of Labor, Fire District 13 is required to restructure how personnel are classified." Glickman Aff., exhibit 23. Presumably, Saraceni was referring to Richards' letter when he wrote, "a recent determination by the United States Department of Labor."

On August 11, 1995, Saraceni once again wrote to Richards, describing the action District 13 had taken to achieve compliance with the FLSA. Glickman Aff., exhibit 24. According to Saraceni, the new plan "eliminated the position of part-time employee, returning our personnel to true volunteer status." *Id.* If there was any response to this letter, and the letter requests none, that response has not been made a part of the summary judgment record.

In view of the fact that the plaintiffs both expected and received hourly compensation, in an amount greater than a "nominal" fee, it is clear that plaintiffs were not volunteers from January 1, 1994, at least until August 7, 1995, when District 13 imposed a "nominal fee" structure. Richards' letter to Saraceni practically compels this conclusion. This conclusion, without more, disposes of no issues in this case, as plaintiffs were paid compensation at greater than the minimum wage for the entire period from January 1, 1994, to August 7, 1995.

■ District 13 contends that, even if it created an employment relationship with the plaintiffs during the time period before August 7, 1995, the plaintiffs were volunteers after August 7, 1995, and properly received only the nominal $ 20.00 fee per eight-hour shift. Therefore, having concluded that plaintiffs were employees of District 13 prior to August 7, 1995, I must now consider whether District 13 properly restructured its staffing to eliminate part-time employees and "return" some former employees to "volunteer" status.[10]

---

**10.** There can be little dispute that the payments, prior to August 7, 1995, constituted compensation for services. At his deposition, Saraceni was asked how he would characterize the payment of $ 8.00 per hour. He replied, "Reimbursement for services." The following colloquy occurred:

Q. Reimbursement for services? That would include—so it would be something that you're paying to a person in return for them providing a service to you?
A. Yes.
Q. Okay. It wasn't reimbursement for expenses?

In support of its argument that it could "return" its employees to "volunteer" status, District 13 relies on a DOL Letter Ruling permitting an employer to "excuse," or "lay off," a municipal employee in order to avoid overtime. Glickman Aff., exhibit 42. District 13 argues, by analogy, that even if an employment relationship existed with the non-career firefighters prior to August 7, 1995, the defendant should be able to "return" the non-career firefighters, including the plaintiffs, to "volunteer status" in order to avoid the minimum wage provisions of the FLSA. For the reasons that follow, I conclude that this analogy fails.

The FLSA does not entitle any employee to overtime. The law merely requires overtime pay for actual hours of overtime worked. On the other hand, the FLSA does require employers to pay at least the minimum wage to all employees. Furthermore, the defendant's contention that it could "reestablish" the volunteer status of the non-career firefighters, even if those firefighters had become employees by virtue of the prior wage structure, flies in the face of the specific provision of the regulations which states that: "An individual shall not be considered a volunteer if the individual is otherwise employed by the same public agency to perform the same type of services as those for which the individual proposes to volunteer." 29 C.F.R. § 553.101(d). In other words, an employee may not, of his or her own accord, assume "volunteer" status once he or she has entered into an employment relationship. This provision is intended to prevent manipulation of employees or abuse of minimum wage requirements through coercion or undue pressure. S.Rep. No. 99–159, *supra*, at 14, 1985 U.S.C.C.A.N. at 662; 29 C.F.R. § 553.101(b). Congress forbade employees from unilaterally offering to volunteer their services to an employer, out of concern that employers might pressure employees to volunteer, or employees might feel obliged to volunteer. Having gone to these lengths to protect employees, ultimately even from themselves, it is unlikely that Congress intended to permit employers to change unilaterally an employee's status to that of a volunteer. I am unwilling to read such an exception into the FLSA. To do so, would completely swallow the rule against employees volunteering their "same-type" services to public employers. 29 C.F.R. §§ 553.101, 553.103.

The relationship between District 13 and the plaintiffs, when viewed in its entirety, is one of employment. Accordingly, plaintiffs' motion for summary judgment on the FLSA claim contained in count one of the complaint must be granted.

### 3. Damages

Plaintiffs have provided, and defendants have not disputed, a calculation of plaintiffs' back wages in the amount of $ 17,765.00. In addition to these back wages, plaintiffs seek liquidated damages in an equal amount.[11]

A. No.
Dep. of Michael A. Saraceni at 41, attached as exhibit L to Aff. Of Steven S. Glickman, Esq.

11. The relevant subsection provides:
Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title in which (1) restraint is sought of any further delay in the payment of unpaid minimum wages, or the

The FLSA, as written, makes an award of liquidated damages mandatory, and the Supreme Court has so interpreted the Act. *See* 29 U.S.C. § 216(b); *Overnight Motor Transportation Co. v. Missel,* 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942). However, dissatisfied with the sometimes harsh results of this interpretation, Congress included a provision in the Portal–to–Portal Pay Act of 1947,, ch. 52, 61 Stat. 84, which grants trial courts the authority to deny or limit liquidated damages when the "employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of the FLSA. 29 U.S.C. § 260.[12]

■ "To avoid liability for liquidated damages, the employer must make a showing of good faith and reasonable grounds for its conduct. If the employer fails to carry its burden of demonstrating good faith and reasonable grounds, the award of liquidated damages is mandatory." *Selker Bros.,* 949 F.2d at 1299. The Third Circuit has made clear that, in demonstrating good faith and reasonable grounds, the employer bears a "plain and substantial" burden of proving his entitlement to discretionary relief. *Tri–County Growers,* 747 F.2d at 128–29.

The good faith requirement is a subjective one that "requires that the employer have an honest intention to ascertain and follow the dictates of the Act." ... The reasonableness requirement imposes an objective standard by which to judge the employer's conduct ... Ignorance alone will not exonerate the employer under the objective reasonableness test....

To carry his burden, a defendant employer must show that he took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions.

*Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 907–08 (3d Cir.1991). Moreover, the Third Circuit has noted that, without more, the mere absence of affirmative evidence in the record that the employer willfully intended to avoid compliance with the FLSA, "falls short of satisfying [the] objective component of the good faith requirement." *Id.* at 909 (citing *Tri–County Growers,* 747 F.2d at 129).

■ As a threshold matter, I note that, although plaintiffs' moving papers assert their entitlement to liquidated damages, defendants nowhere address this issue. Inasmuch as District 13 seeks summary judgment on the plaintiffs' FLSA claim, however, the court may fairly assume that District 13 regards its conduct as meeting the good faith and reasonableness requirements of 29 U.S.C. § 260. Accordingly, relying on the arguments defendant presents in opposition to summary judgment, I will determine whether I may exercise my discretion, consistent with the FLSA and the cases construing it, to deny or limit liquidated damages in this case.

District 13 took affirmative steps toward ascertaining the requirements of the FLSA. In the first place, Saraceni considered himself well-versed in the requirements of the FLSA. Dep. of Saraceni at 723–74, attached as exhibit 12 to Vidal Aff. Saraceni also testified that he had an understanding, largely derived from a seminar he attended, that District 13 was paying the volunteers too much. *Id.* at 80–81. Perhaps to confirm this suspicion, Saraceni wrote to the District Director of the Wage and Hour Division of the Department of Labor requesting an opinion regarding District 13's compliance with the FLSA. In response, Richard C. Richards, District Director of the Wage and Hour Division, alerted Saraceni of the potential "problem" District 13 faced as a result of having paid its "volunteers" from $ 5.05 to $ 9.00 per hour. Richards' letter specifically warned

---

amount of unpaid overtime compensation, as the case may be, owing to such employee under section 206 or section 207 of this title by an employer liable therefor under the provisions of this subsection or (2) legal or equitable relief is sought as a result of alleged violations of section 215(a)(3) of this title.

12. I note that an FLSA plaintiff cannot recover both liquidated damages and pre-judgment interest. *See Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 715, 65 S.Ct. 895, 906, 89 L.Ed. 1296 (1945) (liquidated damages serve "as compensation for delay in payment of sums due under the Act").

Saraceni that "your practice of paying $ 8.00/ $ 9.00 an hour to staff a station is more than a nominal fee and is sufficient to create an employment relationship." Richards did not address, and was not asked to address, whether, if an employment relationship had been created, District 13 could unilaterally end that relationship, and return these "employees" to "volunteer" status. If District 13 took additional steps to ascertain whether such a plan would conform with the FLSA and existing DOL regulations, those steps do not appear in the summary judgment record.

On May 22, 1995, soon after he received Richards' letter, Saraceni communicated with the station commanders, instructing them not to accept any new members for "duty crew" or part-time shifts until further notice. Vidal Aff., exhibit L. Saraceni attributes this change in policy to "a recent ruling by the Department of Labor." *Id.* On July 21, 1995, Saraceni presented the reorganization plan to "All Part-time/volunteer Personnel," including the creation of the "Minimum Staffing" positions. Glickman Aff., exhibit 23. The July 21st memorandum explains that District 13 intends to discontinue its "part-time system," with the exception of "[s]leep-in and weekend [sic] crews," which will remain as "'stipended' shifts only." *Id.* Again, this memorandum clearly implies that these changes were mandated by the Department of Labor. Saraceni begins by referring to Richards' letter as a "recent determination of the United States Department of Labor," although Richards' letter expressly states that it does not represent the official position of the DOL. *Id.* Furthermore, Saraceni states that "due to" that determination, "District 13 is required to restructure how personnel are classified, reimbursed and utilized." *Id.*

On August 11, 1995, Saraceni wrote to Richards to thank him for his earlier letter and to report the results of the reorganization of District 13. Glickman Aff., exhibit 24. There is no evidence that Saraceni, or anyone else, sought an opinion, before August 7, 1995, from the DOL concerning the crucial

issues presented in this case, whether the "volunteers" became "employees" through the receipt of substantial hourly compensation, and, if they did, whether the planned reorganization would reinstate these employees in "volunteer" status. This omission is all the more dramatic, given that District 13 elsewhere relies upon several DOL letter rulings in which public employers submitted planned changes to DOL for approval.[13] *See, e.g.,* Letter Ruling of Oct. 28, 1993 (Board "is considering the adoption of a retention and incentive program"), attached as exhibit 40 to Glickman Aff.; Letter Ruling of Nov. 12, 1993 ("[M]unicipality anticipates creating a program"), attached as exhibit 41 to Glickman Aff.

Thus, District 13 took steps to review the reimbursement scheme in existence prior to August 7, 1995, as it applied to these plaintiffs, but it apparently took no steps to obtain an authoritative review of its planned reorganization. Therefore, District 13's decision to institute its reorganization plan on the strength of a single letter from DOL, in which that plan is not even mentioned, cannot satisfy the objective reasonableness requirement of 29 U.S.C. § 260. Accordingly, I conclude that an award of liquidated damages is mandatory in this case.

## B. Plaintiffs' State Law Claims

 Before this court may consider the motion and cross-motion for summary judgment on plaintiffs' state law claims, I must determine whether the exercise of this court's supplemental jurisdiction is appropriate in this case.

In 1990, Congress combined and codified the judicially created doctrines of pendent and ancillary jurisdiction under the rubric of "Supplemental Jurisdiction." *See* Judicial Improvements Act of 1990, Pub.L. No. 101–650, 104 Stat. 5113 (codified at 28 U.S.C. § 1367). Statutory "Supplemental Jurisdiction," as applied to cases based upon federal question jurisdiction, embodies the jurisdictional standard enunciated by the Supreme Court in *United Mine Workers v. Gibbs,* 383

---

**13.** These letter rulings otherwise provide no support for defendant, inasmuch as they are all factually distinguishable from the instant case.

U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See also Lyon v. Whisman,* 45 F.3d 758, 760 (3d Cir.1995); *Sinclair v. Soniform, Inc.,* 935 F.2d 599, 603 (3d Cir.1991).

To determine whether a claim is part of the "same case or controversy," this court looks to whether "[t]he state and federal claims ... derive from a common nucleus of operative fact." *United Mine Workers,* 383 U.S. at 725, 86 S.Ct. at 1138. In *Lyon,* the Third Circuit held that a plaintiff's claim for overtime wages under the FLSA shared no common nucleus of operative facts with her state law claims for breach of contract and tort based on her employer's alleged failure to pay a promised bonus on time. The Third Circuit pointed out that the proper analysis of the "common nucleus" requirement of *United Mine Workers,* requires an intensely fact-specific inquiry. *Lyon,* 45 F.3d at 760. Moreover, the *Lyon* court declared, that, in a federal court action in which jurisdiction is based upon the FLSA, the fact that both state and federal claims arise out of the "employment relationship," without more, provides an insufficient factual nexus to confer supplemental jurisdiction. *Id.* at 762.

The court in *Lyon* also observed that the FLSA was a statute with a narrow, well-defined purpose—to guarantee minimum standards and eliminate abuses in wages and hours worked. *Id.* at 763. As such, the Third Circuit expressed doubt that Congress, in enacting the FLSA, intended to authorize supplemental jurisdiction to the full extent of Article III. *Id.* at 764. Indeed, the *Lyon* court warned that "when a court exercises federal jurisdiction pursuant to a rather narrow and specialized federal statute it should be circumspect when determining the scope of its supplemental jurisdiction." *Id.*

In *Lyon,* the Third Circuit decided, *sua sponte,* to vacate the district court's order as it applied to the Lyon's state law claims, and to remand with directions to dismiss those claims without prejudice. In view of the fact that neither of the parties in *Lyon* had challenged the district court's exercise of supplemental jurisdiction, just as neither party has challenged supplemental jurisdiction here, the Third Circuit's conclusion in *Lyon* is particularly significant. *See id.* at 764 n. 10.

It is fair to say, at least in actions predicated upon the FLSA, that the Third Circuit "interprets section 1367 and *Gibbs* very narrowly." *Derasmo v. Hospitality Franchise Sys., Inc.,* Civ. A. No. 93–46, 1995 WL 274501, at *8 (D.N.J. May 8, 1995).

■ The Third Circuit clearly indicates that, when a narrow statute such as the FLSA is the only source of federal jurisdiction, the exercise of supplemental jurisdiction is proper only when the state and federal claims "are merely alternative theories of recovery based on the same act." *Lyon,* 45 F.3d at 761 (quoting *Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474, 479 (3d Cir.1979)). Applying the teaching of *Lyon* to the present case, I conclude that plaintiffs' state law claims, both statutory and common law, involve distinct factual issues, which will require distinct proofs, not encompassed within plaintiffs' FLSA claim.

Federal courts in this district routinely exercise supplemental jurisdiction over claims brought under New Jersey's Law Against Discrimination, when jurisdiction is predicated upon Title VII. This is unremarkable, in view of the fact that the Law Against Discrimination is aimed at much the same evils that Title VII addresses, and its analytical structure mirrors that of Title VII. *See, Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1212 (3d Cir.1995) ("New Jersey courts in applying the NJIAD generally follow the standards of proof applicable under the federal discrimination statutes[.]"); *Kapossy v. McGraw–Hill, Inc.,* 921 F.Supp. 234, 240 (D.N.J.1996); *Maidenbaum v. Bally's Park Place,* 870 F.Supp. 1254, 1258 (D.N.J.1994), *aff'd,* 67 F.3d 291 (1995). Indeed, in such cases, the state law claim is generally the equivalent of an alternative legal theory, because it shares the identical factual basis, the challenged employment action.

In this case, plaintiffs' minimum wage claim under the FLSA requires no more than proof of an employment relationship, which is disputed, and proof of the wages paid and time periods involved, which is apparently undisputed. By contrast, plaintiffs' New Jersey statutory claims, as well as their breach of contract claim, require much more.

Plaintiffs contend that District 13 has violated provisions of New Jersey's public employment law, including the following:

> Except as otherwise provided by law no permanent member or officer of the paid or part-paid fire department or force shall be removed from his office, employment or position for political reasons or for any cause other than incapacity, misconduct, or disobedience of rules and regulations established for the government of the paid or part-paid fire department and force, nor shall such member or officer be suspended, removed, fined or reduced in rank from or in office, employment or position therein except for just cause as hereinabove provided and then only upon a written complaint, setting forth the charge or charges against such member or officer.

N.J. Stat. Ann. § 40A:14–19 (West 1993). It is undisputed that no formal charges have been proffered, nor hearings held involving these plaintiffs. However, to prove a violation of this statute, plaintiffs must establish, at a minimum, that they have been "suspended, removed, fined or reduced in rank from or in office, employment or position." This crucial fact is unrelated to plaintiffs' FLSA claim. Indeed, as in *Lyon*, this claim shares no more than the fact of the employment relationship with plaintiffs' FLSA claim. Plaintiffs must prove distinct facts in order to prevail, and they seek much different relief.[14]

Plaintiffs next contend that District 13 violated certain provisions of New Jersey's Exempt Fireman's Tenure Act, which prohibit the removal of any firefighter holding an exempt certificate, except for cause. N.J. Stat. Ann. §§ 40A:14–60, 40A:14–63 (West 1993). Section 40A:14–60 establishes that:

> Whenever any person possessing an exempt fireman certificate holds an office, position or employment of the State, or a county or municipality or a school board or board of education for an indeterminate term, such person shall hold his office, position or employment during good behavior and shall not be removed therefrom

for political reasons but only for good cause after a fair and impartial hearing. Section 40A:14–63 provides that:

> No department of the State government nor any board of chosen freeholders of a county, or governing body of a municipality, or a school board or board of education shall abolish, change the title or reduce the emoluments of any office or position held by an exempt fireman for the purpose of terminating his service.

To establish a violation of these sections, plaintiffs must show, in addition to an employment relationship: (1) that they hold exempt fireman certificates; (2) that they have been subjected to "removal," "change of title," or "reduction in emoluments" within the meaning of the Act; and (3) that these actions were taken for "political reasons," or "for the purpose of terminating [their] services."

These facts exclusively concern District 13's decision to revise its staffing procedures, including its decision to eliminate the weekday "duty crew" shift. By the same token, those facts are entirely superfluous in proving plaintiffs' FLSA claim. Indeed, had District 13, on August 7, 1995, made the same management decisions relating to staffing its firehouses, while continuing the $ 5.05 per hour minimum rate, or even lowered the minimum rate to $ 4.75 per hour, plaintiffs could still have brought this challenge based upon the Exempt Fireman's Tenure Act, although they could not, at that time, have brought suit under the FLSA.

Finally, plaintiffs' breach of contract claim, will require proof of a contract, either written, oral, or implied pursuant to *Woolley v. Hoffmann–La Roche, Inc.*, 99 *N.J.* 284, 491 A.2d 1257, *modified*, 101 *N.J.* 10, 499 A.2d 515 (1985). Although the complaint alleges that the reduction in the rate for "sleep-in" shifts was one element of the breach of contract, a fact which this claim shares with the plaintiffs' FLSA claim, the complaint also alleges that District 13 breached its contract by "terminating wage payments," and by "removing Plaintiffs from their positions."

---

**14.** In the first count of the complaint, plaintiffs' FLSA claim, they seek unpaid minimum wages, liquidated damages, attorneys' fees and costs. In the remaining state law counts, plaintiffs seek reinstatement, compensatory damages, and back wages, as well as attorneys' fees and costs.

Complaint ¶ 33. These last two allegations share common facts with plaintiffs' state law statutory claims, with the additional claim of unpaid back wages, but share no common factual basis with plaintiffs' FLSA claim.

Thus, each of plaintiffs' state law claims involves critical facts in addition to proof of an employment relationship within the meaning of the FLSA. As noted, the employment relationship alone is an insufficient nexus on which to establish supplemental jurisdiction. *Lyon,* 45 F.3d at 762. This pivotal additional factual material, because it is entirely extraneous to the plaintiffs' FLSA claim, counsels caution in the exercise of supplemental jurisdiction in this case. Based on *Lyon,* it is doubtful that supplemental jurisdiction exists under § 1367(a).

However, even if I were to find that plaintiffs' state law causes of action and their FLSA claim arose out of a common nucleus of operative fact, I would still decline to exercise supplemental jurisdiction over those claims. The Supplemental Jurisdiction statute provides that a district court may, in its discretion, decline to assert jurisdiction over a state law claim when "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction." 29 U.S.C. § 1367(c)(2). In this case, plaintiffs' multifaceted state law claims clearly "predominate" over the relatively narrow FLSA minimum wage claim, in that the state law claims involve challenges to the authority and propriety of several decisions taken by the governing officers of District 13.

Accordingly, plaintiffs' claims contained in counts two through four of the complaint will be dismissed without prejudice.

## IV. Conclusion

For all the foregoing reasons, plaintiffs' motion for summary judgment will be granted in part, and summary judgment will be entered in favor of plaintiffs and against Defendant, Cherry Hill Fire District 13 on

plaintiffs' claim for $ 17,765.00 in back wages, and $ 17,765.00 in liquidated damages. The cross-motion of defendant, Cherry Hill Fire District 13, for summary judgment on plaintiffs' FLSA claim will be denied, and plaintiffs' remaining claims based upon alleged violations of New Jersey statutory and common law will be dismissed without prejudice. Plaintiffs' motion for summary judgment on their New Jersey statutory claims will be dismissed as moot; Cherry Hill Fire District 13's cross-motion for summary judgment on plaintiffs' New Jersey statutory claims and on plaintiffs' common law claim for breach of contract will likewise be dismissed as moot. In view of the fact that summary judgment will be entered in favor of the plaintiffs, plaintiffs are also entitled to an award of attorneys' fees and costs pursuant to 29 U.S.C. § 216.[15] The court will enter an appropriate order.

---

15. This section provides, in pertinent part: "The court in [any private party] action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

29 U.S.C. § 216(b). Accordingly, this court will retain its jurisdiction to entertain an application on the plaintiffs' behalf for reasonable attorneys' fees associated with its FLSA claim.