Gregg Alan BENSHOFF, et al., Plaintiff,

v.

CITY OF VIRGINIA BEACH Defendant.

No. CIV. A. 2:97CV975.

United States District Court,
E.D. Virginia,
Norfolk Division.

June 10, 1998.

Gregory Keith McGillivary, Thomas A. Woodley, Kurt T. Rumsfeld, Mulholland & Hickey, Washington, DC, for Gregg Alan Benshoff, Zeno Nichols, Jr., Paul Robert Criswell, Jeffrey L. Floyd, George Marshall, Alan G. Taylor, Alan Paul Walters, plaintiffs.

Stanley G. Barr, Jr., Robert Jon Barry, Kaufman & Canoles, Norfolk, VA, Randall Mahlon Blow, Virginia Beach City Attorney's Office, Richard Jay Beaver, Office Of The City Attorney, Virginia Beach, VA, Lawrence Steven Emmert, Office Of The City Attorney, Virginia Beach, VA, Scott William Kezman, Kaufman & Canoles, P.C., Norfolk, VA, for City of Virginia Beach, defendants.

### ORDER AND OPINION

DOUMAR, District Judge.

The plaintiffs Gregg Benshoff, *et al.* moved for partial summary judgment and defendant City of Virginia Beach ("City") moved for summary judgment. The parties indicated at the hearing that there were no material facts in dispute. For the reasons set forth below, the Court DENIES plaintiffs' motion for partial summary judgment and GRANTS defendant's motion for summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Each of the plaintiffs in this action is a master firefighter employed by the City Fire Department claiming overtime pay for hours furnished to what are allegedly volunteer rescue squads. In addition to the Fire Department, the City also maintains a Department of Emergency Medical Services ("DEMS") which interacts with the Fire Department and 11 private rescue squads serving City residents.

Plaintiff Gregg Benshoff ("Benshoff") became a member of the Virginia Beach Fire Department in 1985. Before joining the Virginia Beach Fire Department, he was a vol-

**612**

unteer firefighter in Pittsburg, Pennsylvania. Benshoff joined the Blackwater Volunteer Fire Department and Rescue Squad, Inc. ("Blackwater Squad") located in Virginia Beach in 1995. In June, 1997, Benshoff transferred to the Kempsville Rescue Squad, Inc. ("Kempsville") also located in Virginia Beach. According to Benshoff, his motivation for joining the Blackwater Squad concerned "moral issues . . . I could not sit back and watch somebody suffer while I had the training to take care of that . . . [a service I could perform] from the fire apparatus when I was working." Benshoff Dep. at 29. Benshoff also stated that he did not become a rescue squad member for career enhancement or promotion, but because it would "make me feel better." *Id.* at 30.

Plaintiff Paul Criswell ("Criswell") joined the City Fire Department in 1990. Prior to this employment, he volunteered for the Oceana Volunteer Fire Department located in Virginia Beach from 1988–1990. Criswell was already a member of the Princess Anne Courthouse Volunteer Rescue Squad and Fire Department, Inc. ("Courthouse Squad") located in Virginia Beach when he joined the City Fire Department. Criswell resigned from the Courthouse Squad and became a member of the Ocean Park Volunteer Fire and Rescue Unit, Inc. ("Ocean Park Squad") located in Virginia Beach in February 1998. According to Criswell, his motivation for becoming a rescue squad member was "[t]o make me initially more marketable to get hired with the paid fire department and to provide service to the citizens." Criswell Dep. at 59. When asked whether he would continue as a rescue squad member if he knew he would not get paid, Criswell responded "I would feel I would have no choice because of the moral issues that I have to provide the level of training that I have been trained to . . . . The citizens would suffer." *Id.* at 60–61.

Plaintiff Jeffrey Floyd ("Floyd") joined the City Fire Department in 1975. He became a member of the Courthouse Squad in 1994 but resigned from the squad in May, 1996. He states that his motivation for joining the rescue squad was because "I noticed when I would respond on fire response down here that there was a need for advance life saving ("ALS") more so down here because we're [located] in the rural part of the [county] . . . and I felt that I could better my career and help the people of—citizens of Virginia Beach to go on and get ALS care so I could render that to them off the fire truck." Floyd Dep. at 85.

Plaintiff George Marshall ("Marshall") joined the City Fire Department in 1988 after working as a firefighter with the York County Fire Department for several years. Marshall was already a member of the Virginia Beach Volunteer Rescue Squad, Inc. ("Virginia Beach Squad") before he joined the City Fire Department. When asked what motivated him to become a member of the rescue squad, Marshall stated that he wanted to "[m]aintain my skills . . . [a]ll my friends were members . . . [t]here were not a lot of ALS providers when I first came in. So it was a—to help out." Marshall Dep. at 108–09. Marshall also declared that he thought joining the rescue squad would hinder rather than enhance his firefighting career "[b]ecause we fall into a grey area between the two departments. I never expected it to do anything for me other than to be able to help out people." *Id.* at 109. Marshall claims he had no expectation of being paid for his work with the rescue squad until he heard that the City was possibly violating the Fair Labor Standards Act ("FLSA"). *Id.*

Plaintiff Zeno Nichols, Jr. ("Nichols") joined the City Fire Department in 1972. He joined the Sandbridge Rescue and Fire, Inc. ("Sandbridge Squad") located in Virginia Beach in 1995 but transferred to the Kempsville Squad in August, 1997. His reasons for joining the rescue squad were because "too many times [I was] on a scene [that] needed a paramedic and there just wasn't one there." Nichols Dep. at 17. Nichols went on to explain that he did not expect to get paid when he volunteered for the rescue squad, that firefighters were not required to provide advance life saving service, and he did not think being a rescue squad member would be good for his career, but "good for the citizens." Nichols Dep. at 46–48.

Plaintiff Alan Taylor ("Taylor") joined the City Fire Department in 1988 after working

as a volunteer for the London Bridge Volunteer Fire Department located in Virginia Beach from 1985–88. He became a member of the Courthouse Squad shortly after joining the City Fire Department in 1988, but was terminated from the rescue squad in February, 1998 for missing assigned shifts. When asked why he joined the rescue squad, Taylor stated that "I was approached by [rescue squad] members there because obviously working on the fire side, the EMS side is right there. They were having problems manning their ambulances. So they asked me if I would join to give them a hand." Taylor Dep. at 18.

Plaintiff Alan Walters ("Walters") joined the City Fire Department in 1989 after working for the Thalia Fire Station located in Virginia Beach as a volunteer for a couple of years. He became a member of the Kempsville Squad in 1989 about five months after joining the City Fire Department. He resigned from the rescue squad in August, 1997. Walter's motivation for becoming a rescue squad member was because he "like[d] knowledge; and it just gave [him] more chance to do stuff and [gave him] more knowledge." Walters Dep. at 15. Walters also stated that when he first volunteered for the rescue squad, he did not expect to get paid for the time that he spent as a volunteer. Walters Dep. at 49.

All 11 volunteer rescue squads are separately incorporated, non-profit entities. They were created years ago as volunteer citizen organizations. As required by Virginia corporation law, the rescue squads are governed by their own respective boards of directors. The City has no control over the membership of these boards; rather, the membership of the individual rescue squads elects the directors. The governing policies may be changed by these directors from time to time as with any corporation, and they can be disbanded and dissolved without City involvement. Bruce W. Edwards, the Director of the DEMS, has recognized that "the volunteer rescue squads are a separate entity. For example, I cannot tell them how they are going to fund-raise; I cannot tell them how they are going to hold their elections or set up various policies and procedures within

their rescue squads when it comes to these provisions." Edwards Dep. at 54.

The Ocean Park Squad was originally incorporated in 1946 when the current City of Virginia Beach was Princess Anne County. To become a member of this organization, an applicant has to be interviewed and endorsed by at least one member of the Membership Committee and one other Full Member. Ocean Park Squad Bylaws at 4. The applicant must then receive a two-thirds vote from the membership to be accepted as a member of Ocean Park Squad. *Id.* To be dismissed from the Ocean Park Squad, a three-quarters vote of the Full Members is required. Ocean Park Squad Bylaws at 12. Disciplinary charges are filed with the Secretary, who then brings the matter before the Executive Board for review and possible selection for the Disciplinary Committee. *Id.*

The Courthouse Squad was originally incorporated in 1952 when the current City of Virginia Beach was Princess Anne County. Under its bylaws, a prospective member is presented by the Vice–President to the membership, who then votes on admitting the applicant to the Courthouse Squad as a Probationary Member. Courthouse Squad Bylaws at 6. After obtaining a city-issued ID card indicating the Probationary Member's medical certification level, the membership will vote on changing the Probationary Member's status to Operational Probationary. *Id.* After successful completion of the Operational Probationary Period, the membership votes on whether to admit the applicant as an Active Member. *Id.* Dismissal from the Courthouse Squad must be presented to the Board of Directors for review and approval. Courthouse Squad Bylaws at 13. Furthermore, if a member is dropped by the DEMS or the City Fire Department, the member will also be dropped from the Courthouse Squad. Courthouse Squad Bylaws at 5. The President or Squad Commander has the authority to suspend a member accused of wrongdoing pending investigation of the matter. Courthouse Squad Bylaws at 13. Disciplined members have a right to appeal to the Board of Directors. *Id.*

The Kempsville Squad was originally incorporated in 1967. After investigation by

the Membership Committee, an applicant is voted upon by written ballot. Kempsville Squad Bylaws at 207a. A two-thirds vote by the members who are entitled to vote constitutes acceptance as an Apprentice Member. *Id.* Permanent membership is possible after successful completion of the apprenticeship, which lasts between 6–12 months. *Id.* No member of the Kempsville Squad can be expelled except through a majority vote of the membership. Kempsville Squad Bylaws at 112a. Disciplinary problems are handled by the appropriate senior operational officer and disciplined members have a right to appeal to the Board of Directors. *Id.*

The Blackwater Squad was originally incorporated in 1987. Operational Officers interview candidates for membership, and then make recommendations for or against acceptance by the membership. Blackwater Squad Bylaws at 4. Members then vote on acceptance at the next business meeting. *Id.* Dismissal from the rescue squad is acted upon by the Board of Directors, while suspensions and grievances must be in writing and require a two-thirds vote by the membership for approval. Blackwater Squad Bylaws at 8.

The Virginia Beach Squad was incorporated in 1990. Applications for membership are voted on at a membership meeting. Virginia Beach Squad Bylaws at 4. Ten percent of the voting membership but not less than 5 negative votes constitutes rejection of the application. *Id.* An affirmative vote is understood to permit probationary membership, and final acceptance for membership is acted upon at least 6 months after the probationary membership begins. *Id.* Dismissal from the rescue squad requires a hearing at a membership meeting, followed by a three-quarters vote by the membership. Virginia Beach Squad Bylaws at 21. Violations of the bylaws and other infractions are investigated by the Executive Committee, but the Captain has the power to suspend members for violations. Virginia Beach Squad Bylaws at 20.

The Sandbridge Squad was incorporated in 1994. Membership in the squad requires a majority vote by the membership, and removal from the squad requires a two-thirds majority vote by the membership. Sandbridge Squad Bylaws at 3.

In an effort to provide timely responses to emergencies, both City firefighters and volunteer rescue squad personnel are often dispatched to the scenes of medical emergencies. The DEMS has obtained a license from the Commonwealth of Virginia authorizing it to provide basic life support ("BLS") so that firefighters are able to deliver BLS to the citizens of Virginia Beach on a "first response" basis. BLS consists of skills that are necessary to immediately respond to an emergency scene such as basic patient care and transportation to local medical facilities. The City does not have a license permitting it to furnish ALS to individuals in need of that level of care. ALS consists of skills based on BLS but with a higher level of care where advanced techniques such as IV therapy, electrical defibrillation, and EKG monitoring are used. The City does not have an ALS license from the state, and thus it does not require any of its firefighters to become certified to provide ALS care. In order to become ALS certified, one must be a member of a rescue squad.

ALS care in the City is usually provided by the members of the 11 private, volunteer rescue squads. Each of these rescue squads is independently licensed by the state to provide ALS care. Rescue squad volunteers who hold the appropriate ALS certifications can provide ALS care under the auspices of their rescue squad's ALS license. City firefighters with ALS certifications may, but are not obligated to, provide ALS services while on City time as firefighters. Only members of a rescue squad may maintain certification. All of the plaintiffs in this matter currently hold some type of ALS certification.

The City did establish the DEMS to act as a coordinating body to support and enhance the delivery of emergency medical services ("EMS") services within the City, and volunteer rescue squad members are also members of the DEMS. The DEMS consists of four divisions. The Administrative Division administers programs such as recruitment and application procedures, the Training Division conducts all training of DEMS personnel, the Regulation and En-

forcement Division enforces compliance with applicable regulations, and the Operations Division manages ambulance and rescue personnel and support equipment. The DEMS is also responsible for BLS and ALS certification of rescue squad members as well as preparing and distributing monthly duty rosters assigning the plaintiffs and other DEMS members to work shifts at the various rescue squads. A DEMS member must serve from 24 to 48 hours of pre-scheduled duty per month in order to maintain certification. However, ALS providers who operate as Associate members are only required to serve two twelve-hour pre-scheduled duties per month to maintain certification. The City also has a disciplinary policy for DEMS members which includes reprimands, suspensions, and dismissals. However, it is the individual rescue squads and not the City that have the authority to approve or terminate rescue squad membership.

The plaintiffs filed their complaint in this Court on October 14, 1997 seeking to be paid time and one-half their regular rate of pay under FLSA for time they served as volunteer emergency medical technicians ("EMT"). On April 10, 1998, the City filed a motion for summary judgment. On April 20, 1998, the plaintiffs filed a motion for partial summary judgment and on April 24, 1998, the plaintiffs filed their brief in opposition to defendant's motion for summary judgment. On April 30, 1998, the City filed its brief in opposition to plaintiffs' partial motion for summary judgment. The plaintiffs replied to this brief on May 1, 1998. On this same date, the City responded to the plaintiffs' brief in opposition to defendant's motion for summary judgment. A hearing on these motions was held on May 6, 1998. The plaintiffs filed a post-hearing memorandum on May 12, 1998 and the City filed a supplemental memorandum in support of summary judgment on May 15, 1998 at the request of the Court.

## *MOTIONS FOR SUMMARY JUDGMENT*

### I. Standard of Review

Fed. R. of Civ. P. 56(c) provides in relevant part that summary judgment should be granted where "the pleadings, depositions [and] answers to interrogatories ... show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court explained that, "[i]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The non-moving party must demonstrate that there are specific facts which create a genuine issue for trial. *Id.* at 250, 106 S.Ct. 2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *United States v. Lee*, 943 F.2d 366, 368 (4th Cir. 1991).

With regard to FLSA, the Supreme Court has stated in *dicta* that FLSA claims can be characterized as mixed questions of law and fact. *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *see also Graham v. City of Chicago*, 828 F.Supp. 576, 583 (N.D.Ill. 1993)("[w]e feel that the question is best described as a mixed question of law and fact. The precise nature of the Plaintiff's duties is a question of fact while the application of FLSA to those duties is clearly a question of law"). Thus, the matter at hand can be decided on summary judgment.

### II. FLSA

The City argues that it is exempt from the general requirements to pay the plaintiff employees overtime for the additional hours of service as EMTs because they are rendering that service in a "volunteer" capac-

ity and not in an "employee" capacity. FLSA is designed to provide overtime protections to employees who labor long hours. The humanitarian purposes in enacting the premium pay requirements are two-fold: (1) to fairly compensate employees for the burden of working extended hours on behalf of their employer; and (2) to spread employment by placing financial pressure on employers to hire more workers. *Donovan v. Brown Equip. & Serv. Tools, Inc.*, 666 F.2d 148, 152 (5th Cir.1982). In keeping with these remedial purposes, the courts construe the statute "in favor of the workers whom it was designed to protect." *Wirtz v. Ti Ti Peat Humus Co.*, 373 F.2d 209, 212 (4th Cir.1967).

FLSA defines the term "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee ..." 29 U.S.C. § 203(d). The term "employee" means "any individual employed by an employer." 29 U.S.C. § 203(e)(1).

In 1985, Congress enacted amendments to FLSA which included an exemption from the definition of "employee" and the attendant pay requirements for individuals who are rendering service as "volunteers" for a state or local government employer. Specifically, 29 U.S.C. § 203(e)(4)(A)(ii) provides:

> The term "employee" does not include any individual who volunteers to perform services for a public agency which is a State, a political subdivision of a State, or an interstate governmental agency, if
>
> \*  \*  \*  \*  \*  \*
>
> (ii) such services are not the same type of services which the individual is employed to perform for such public agency.

According to the Department of Labor ("DOL"), in enacting this portion of FLSA, "Congress did not intend to discourage or impede volunteer activities undertaken for civic, charitable, or humanitarian purposes, but expressed its wish to prevent any manipulation or abuse of minimum wage or overtime requirements through coercion or undue pressure upon individuals to 'volunteer' their services." 29 C.F.R. § 553.101(b).

## III.  Burden of Proof

The parties disagree on which side has the burden of proof in this case. Plaintiffs argue that since they are employees of the City through the City Fire Department, the City has the burden of proving they are volunteers serving the City through the rescue squads, and therefore are not employees of DEMS. The City, on the other hand, contends that since the plaintiffs are claiming they are providing services for the benefit of the DEMS rather than the rescue squads, it is the plaintiffs who must prove they are employed by DEMS.

█ It is true that an employer who relies on a statutory exception to the FLSA overtime obligations must shoulder a heavy burden to support its claim. FLSA exemptions "are to be narrowly construed against the employer asserting them". *Johnson v. City of Columbia*, 949 F.2d 127, 129–30 (4th Cir.1991) (en banc) quoting *Donovan*, 666 F.2d at 153. In addition, the burden is on the employer to show that it is entitled to the benefits of an exception from FLSA's minimum wage and overtime protections. *Id.* at 130.

█ The City, however, argues that its position that the plaintiffs were volunteers does not constitute an exemption under FLSA. Instead, the City contends that the plaintiffs do not meet the definition of employees with regard to their hours given as rescue squad volunteers.[1] The Court agrees.

---

**1.** In *Truslow v. Spotsylvania County Sheriff*, 783 F.Supp. 274, 278 (E.D.Va.1992), the Honorable Judge Thomas Ellis, III held that the fact that an employee may volunteer for a particular assignment is, without more, irrelevant. The court in *Truslow* emphasized the fact that FLSA defines "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). Thus, "the crucial question is not whether the work was voluntary, but rather whether the plaintiff was in fact performing ser-

vices for the benefit of the employer with the knowledge and approval of the employer." *Truslow*, 783 F.Supp. at 277 (E.D.Va.1992) quoting *Steiner v. Mitchell*, 350 U.S. 247, 251, 76 S.Ct. 330, 100 L.Ed. 267 (1956); *see also* 29 C.F.R. § 785.11 ("[w]ork not requested but suffered or permitted is work time").

The *Truslow* case, however, can be distinguished from the matter at hand. In that case, a deputy sheriff assigned to the canine unit

In *Reich v. ConAgra, Inc.*, 987 F.2d 1357 (8th Cir.1993), the court had a similar question before it and ruled that the plaintiff, then Secretary of Labor Reich, had the burden of proving that certain employees of ConAgra were "employed" when they "volunteered" to perform certain services. Reich had argued that since they were volunteers, he did not have to prove the employment relationship, but rather ConAgra had to prove the exemption.

ConAgra traded as NWF & C in the sale of fabrics and craft items. Although the store did not sell finished items, there were models displaying finished items to show the end use of its products and to increase sales. The finished items were made by NWF & C employees after hours as part of a "display model program." Under the program, employees could make garments for display from the products for sale in the store free of charge. If the employees completed the garment within a specific time (two weeks) and allowed it to be displayed for six weeks, after the six week display period they could keep it. However, if the model was not completed on time, the employee would have to pay for the products used. The program was voluntary and no employment benefit of any kind was given to employees who participated, although they did get to keep the display model for their own use.

Reich claimed the model program was "hours worked" for which ConAgra was required to keep records. The parties filed cross motions for summary judgment, and the district court entered judgment for Reich on the theory that Reich did not have to prove an employment relationship but, rather, since the court interpreted ConAgra's defense as a claimed exemption, ConAgra had the burden of proving that an employment relationship did not exist. ConAgra appealed.

The Court of Appeals reversed, finding that even though the participants in the "display model program" were otherwise employed by ConAgra, Reich still had to prove an employer-employee relationship with respect to the model program.

> ConAgra correctly points out that the Secretary has the burden of proof on the threshold issue of whether an employer-employee relationship exists *with regard to the activities in question.* *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); *Marshall v. Truman Arnold Distrib. Co., Inc.*, 640 F.2d 906, 911 (8th Cir. 1981). ConAgra's entire defense to the Secretary's claim is based on the premise that no employer-employee relationship exists with regard to the display model program. Thus, the Secretary properly has the burden to prove that the Act is apposite to this case. Since ConAgra's defense is based on inapplicability of the Act, and not on an exemption from the Act, the district court employed the wrong burden of proof.

*ConAgra*, 987 F.2d at 1360 (emphasis added).

Plaintiffs here argue that by showing that the DEMS, through its Director, directs the delivery of emergency medical services by the rescue squads and City Fire Department, and these services benefit the citizens, the City must then prove an employment relationship does not exist. This Court disagrees.

The City acknowledges that the rescue squad activities are coordinated by the DEMS; however, the rescue squads are not governed and controlled by the DEMS. *See* Edwards Dep. at 422:

> The employer-employee relationship does not lend itself to rigid per se definitions,

brought action under FLSA against his employer for off-duty care of his police dog and related activities. *Truslow*, 783 F.Supp. at 276. Unlike the case at hand, the *Truslow* case involved the Portal to Portal Act of 1947, which states that an employer need not compensate his/her employees for activities that are "preliminary to or postliminary" to the "principal activity" which an employee is engaged to perform, unless the employer is otherwise required to compensate her employees for such work by custom, contract, or practice. 29 U.S.C. § 254(a)(2) and (b). Certainly, the rescue squad activities do not seem to be "preliminary/postliminary", much less "integral/indispensable" to the firefighting activities. In addition, these home dog care activities were required duties of employment, while firefighters become members of rescue squads at their own discretion.

but depends "upon the circumstances of the whole activity." ... In *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944) the Court explained that the Act applies to "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Id.* at 598, 64 S.Ct. 698.... ConAgra argues that, on the record before the district court, the Secretary failed to demonstrate that the activities are controlled by NWF & C or that the sewing and crafting primarily benefits NWF & C. We agree.

*ConAgra*, 987 F.2d at 1361 (citations omitted).

The evidence in this case shows that the plaintiffs, and those similarly situated, each make their own decision to join a rescue squad and provide emergency medical services. Three of the plaintiffs, Criswell, Floyd, and Walters, resigned from their squad when they decided that the requirements were too much. *See* Criswell Dep. at 10; Floyd Dep. at 12; Walters Dep. at 18. Criswell has since rejoined a squad which offers associate membership and reduced requirements. Criswell Dep. at 62. Each of plaintiffs chose to become ALS certified although this advanced training garnered them no additional benefit as City firefighters. They knew that in order to practice their newly acquired skill, they had to join a licensed ALS agency, and the only licensed agencies were private rescue squads. Benshoff Dep. at 63; Criswell Dep. at 61; Marshall Dep. at 90; Nichols Dep. at 22; Walters Dep. at 37. Furthermore, despite the DEMS' coordination of rescue squad activities, the rescue squads retain the right to accept or expel members based on their own criteria and power, not that of DEMS. For example, Plaintiff Taylor was expelled from the Courthouse Squad for failing to appear at three scheduled meetings. Taylor Dep. at 26. That had no effect on his employment with the Fire Department, and the DEMS was not consulted. As the court in *ConAgra* stated,

An employee's decision to participate in the program is completely voluntary. Participation is not a job requirement and has no effect on wages, hours, opportunity for advancement, or other terms and conditions of employment .... Based on the stipulated facts and affidavits in the record, the Secretary has not demonstrated sufficient control by NWF & C over the program to establish that an employer-employee relationship exists as a matter of law.

*ConAgra*, 987 F.2d at 1361.

To create an employer-employee relationship, the worker's activities also must primarily benefit the employer. *ConAgra*, 987 F.2d at 1361. Here, the plaintiffs argue that providing emergency medical service benefits the citizens of the City, and therefore, they are employees of DEMS. Under that logic, all 800 members of the rescue squads are employees of DEMS and that clearly is not the case. The 800 rescue squad members are members of the DEMS, but a volunteer "member" cannot be equated with a paid "employee". To satisfy the "benefit" test, the plaintiffs would have to prove that the City is the primary beneficiary of its services. As the *ConAgra* court stated:

The Secretary has also failed to show that NWF & C is the *primary* beneficiary of the sewing and crafting performed by display model program participants. Although NWF & C undoubtedly benefits from increased sales attributable to use of display models and from having its employees familiarize themselves with NWF & C's products by working with them, many activities that benefit employers are not considered employment under the Act.

*ConAgra*, 987 F.2d at 1361. Just because the plaintiffs are "members" of the DEMS, this does not in turn mean that they are automatically "employed" by the DEMS. Therefore, the plaintiffs must prove that they are employed by the DEMS, and thus the burden of proof is on the plaintiffs.

## IV. The Rescue Squads are Not the Same Public Agency as the City

The City argues that it is entitled to summary judgment unless the plaintiffs can

show that the services are performed for the same public agency. The plaintiffs contend that the private or public nature of the rescue squads is not relevant to the issues at hand.[2] The Court disagrees with the plaintiffs.

FLSA defines a "public agency" as follows: "[P]ublic agency means the Government of the United States; the government of a State or political subdivision thereof ...." 29 U.S.C. § 203. This definition has been elaborated upon by the Supreme Court in *NLRB v. Natural Gas Utility District*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971). In *Hawkins*, the Supreme Court defined "political subdivision." The Supreme Court approved an interpretation offered by the National Labor Relations Board that indicated that the term means entities that are: "(1) created directly by the state, so as to constitute departments or administrative arms of the government or (2) administered by individuals who are responsible to public officials or to the general electorate." *Id.* 402 U.S. at 604–05, 91 S.Ct. 1746.

A Ninth Circuit case has applied the *Hawkins* factors in determining whether a nonprofit corporation that managed a public museum for historic aircraft was a *de facto* public agency or an activity of a public agency so as to subject the museum to the FLSA. *Powell v. Tucson Air Museum Found.*, 771 F.2d 1309 (9th Cir.1985); *see also Skills Dev. Servs., Inc. v. Donovan*, 728 F.2d 294 (6th Cir.1984) (private contractor performing mental health services on behalf of the state of Tennessee did not lose its private status and become a "joint employer" with the state of Tennessee); *Williams v. Eastside Mental Health Ctr., Inc.*, 669 F.2d 671 (11th Cir. 1982) (not-for-profit mental health institution created by state mental health authority was not a political subdivision of the state of Alabama). Powell was a museum guard who claimed overtime under FLSA. *Powell*, 771 F.2d at 1310. Her employer, the Tucson Air Museum Foundation, claimed that it was exempt from the FLSA because it was not an enterprise engaged in commerce or in the production of goods for commerce. *Id.* at 1311. Powell argued that the museum was a "public agency essentially because it performed the activities of a public agency." *Id.*

The Court of Appeals found evidence of extensive control by the county over the Foundation' activities: a lease to the Foundation from the county; a management agreement to operate the museum, the county reserved the right to approve admission fees, hours of operation and accounting methods; and the museum was required to submit an annual budget and submit to an audit by the county. Nevertheless, the court held that the Foundation was still a private, non-profit entity and thus, the museum was not a public agency. *Id.* at 1311. The key factors in the Ninth Circuit's analysis were whether the entity was directly responsible to public officials or to the general public, and whether the parties' contracts designated them as independent contractors instead of state agencies. *Id.* at 1311–12. The Court also noted that the existence of an independent board of directors over which county had no power of appointment or removal was important in its decision. *Id.* at 1312.

In addition, a district court case from Maryland dealt with the issue of whether volunteer fire departments and volunteer rescue squads were private entities. *Conway v. Takoma Park Volunteer Fire Dep't, Inc.*, 666 F.Supp. 786 (D.Md.1987). The court stated that its decision was difficult because these volunteer fire departments and rescue squads had attributes of both public and private corporations. *Id.* at 792. The court found that they were: (1) privately incorpo-

---

**2.** The plaintiffs' argument seems to be that any volunteer work by the City employee which benefits the citizens of Virginia Beach, if it is the "same or similar" to the person's duties with the City, is "time worked" for the City. Yet under this theory, it would appear that a firefighter could not volunteer to provide ALS services to private rescue squads because this benefits the citizens of Virginia Beach, but no person employed by the City could ever volunteer his or her skills and time to anyone in an activity similar to his or her City job if some resident of the City would benefit. However, this argument ignores the intent of Congress when it enacted the "volunteer" exception to the FLSA. *See* 29 C.F.R. § 553.101(b) ("Congress did not intend to discourage or impede volunteer activities undertaken for civic, charitable, or humanitarian purposes ...").

rated; (2) held property in their own right; (3) could receive private funds; (4) could sue and be sued in their own name; and (6) operated under their own standard operating procedures. *Id.* On the other hand, these entities received substantial tax funds from the county, hired their employees pursuant to civil service rules and received other county support services such as job testing of applicants, training, and communications from the county. *Id.*

In weighing the public versus private balance, the court was ultimately swayed by its determination that these entities were controlled by their own respective boards of directors and that none of these boards were under public control. The county itself also regarded the volunteer fire departments and rescue squads as private organizations. Based on these factors, the court held that the volunteer fire departments and rescue squads were private entities.

In determining whether the *Hawkins* requirements are met in this case, it is clear that the volunteer rescue squads are independently organized, private non-profit organizations and thus are not created by the state. As to their administration, the DEMS does retain a fairly extensive amount of supervisory control over the EMTs actual delivery of medical services. Since the 1980's, the City has moved in the direction of increasing control over the management, staffing, training, and delivery of emergency medical services within the City's boundaries. In 1990, the City Council passed an Ordinance which allowed the City to coordinate the volunteer rescue squad services under the newly created DEMS. The City Code also states that the rescue squads are an "integral part of the official public safety program of the city."

Despite this control by the City, the control is limited. First, the governance of the volunteer rescue squads resides in their own respective boards of directors, and the City has no authority over the appointment or removal of these directors. These boards retain authority to administer the activities of the rescue squad, such as finances, fundraising, and even disbanding the squad. Second, although the DEMS Director coordinates the services performed by rescue squad members, the power to select or remove a member of the rescue squad is vested in the squad itself. It hardly seems fair to require the City to compensate individuals for whom they do not have absolute authority to approve of and dismiss.

Therefore, these privately organized, non-profit corporations with separate boards of directors are not administered by individuals who are responsible to public officials or to the general electorate. Under *Hawkins,* this means that the volunteer rescue squads cannot be public agencies within the meaning of 29 U.S.C. § 203(3).[3]

Furthermore, as with the county in the *Takoma Park* case, the City itself regards the volunteer fire departments as private organizations. For example, the EMS Recruitment Handbook distributed by the City states that these volunteer rescue squads are "ALL VOLUNTEER" organizations which, in 1995, were found to have saved the City "over 7.8 million tax dollars annually." *See* EMS Recruitment Handbook at 2 (emphasis in original). Therefore, it follows that the plaintiff firefighters in the instant case cannot be volunteering their services impermissibly to the same public agency since they are not volunteering their services to a public agency at all. Because the plaintiffs have failed to show that they are providing services for the same public agency, the Court does not need to reach the issue of whether the plaintiffs' rescue squad services are similar or identical to those services they are

---

**3.** Furthermore, the Attorney General of Virginia has expressed the opinion that not for profit volunteer rescue squads are not "public bodies" for purposes of compliance with the Virginia Public Procurement Requirement Act. *See* Supplemental Appendix, Exhibit DD at 65. The Attorney General reasoned that a public body must be part of either the legislative, executive, or judicial branch of the government as well as a body created by law rather than by the private voluntary actions of its organizers. " ... volunteer rescue squads are created by the voluntary action of their members, even though government approval may be required before they undertake their intended functions." *Id.*

employed to perform as firefighters.[4]

## V. The Definition of "Volunteer"

In ruling on this matter, the Court believes that it is important to evaluate the basic principles behind volunteerism in the public sector. Congressional intent provides some insight into the matter.

In 1985, Congress passed amendments to FLSA intended to create certain exclusions for employees of state and local governments. It was the intent of Congress " 'to make clear that persons performing volunteer services for state and local governments should not be regarded as "employees" under the statute'." *Krause v. Cherry Hill Fire Dist. 13*, 969 F.Supp. 270, 276 (D.N.J.1997) quoting S.Rep. No. 99–159, at 14 (1985). However, "what Congress failed to make clear ... is when a person is a 'volunteer', and when he or she is an 'employee'." *Id.* at 276.

The regulation defining the term "volunteer" for the purposes of FLSA provides:

An individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered, is considered to be a volunteer during such hours.

29 C.F.R. § 553.101(a) (1996). This definition has been interpreted as containing two requirements: (1) a civic, charitable, or humanitarian reason; and (2) the absence of an expectation of, or actual compensation for services rendered. *Krause*, 969 F.Supp. at 276.

With regard to the first requirement, the plaintiff's subjective motivation is a factor in determining an individual's volunteer status. *Rodriguez v. Township of Holiday Lakes*, 866 F.Supp. 1012, 1019 (S.D.Tex. 1994).[5] This subjective motivation requires more than a "generalized public spiritedness" on the part of the individual concerned or that the organization for which the individual performs services be the type which is involved in a "civic, charitable, or humanitarian" purpose. *Krause*, 969 F.Supp. at 276.

---

4. According to a 1993 DOL Opinion Letter firefighters employed by a city who perform additional emergency medical services for the benefit of the city are not acting within the "volunteer" exception, but rather as "employees" performing similar services for the benefit of their city employer, and thus they are entitled to overtime compensation by the city. The DOL reasoned:

Under the circumstances described in your letter, including the integrated structure of the City's official safety program services, it is our view that all work involving like duties or services performed by paid career City firefighter/EMTs within the City, whether the firefighter/EMT reports to the City or to the Crew, is compensable and must be included in determining whether the firefighter/EMT has worked overtime hours for the purposes of the FLSA. We view the underlying purpose and rationale of § 3(e)(4)(A) as requiring this result. Pursuant to § 3(e)(4), an individual is not permitted to "volunteer" to perform services for a public agency if such services are the same type of services that the individual is employed to perform for the public agency. Although the Crew may be a corporate entity separate from the City, services performed by its "volunteer" personnel, who are also City employees, are clearly performed "for" the City. Not only do the services directly benefit the City, but they are identical to the services performed by these and other City employees
...

However, this Court is not obligated to follow the letter opinions of the Administrator of the DOL. Opinion letters from the DOL administrator are entitled to only "limited deference". *ConAgra*, 987 F.2d at 1360, n. 3 citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). In addition, the opinion letter in question involved contracted service provided by the "Crew" to a City. The volunteers to the Crew provided the same services under the contract that other City employees were providing, at a time when the other City employees were not available. Because the City controlled the contract, the Administrator concluded that it controlled the Crew. Here, there is no contract between the rescue squads and the City and the services are not being provided at a time when other City employees are not available. Furthermore, the evidence shows that the rescue squads are independent and "not responsible to the general public." *In Re Lower Merion Township Fire Dept. Labor Standards Litig.*, 972 F.Supp. 315, 325 (E.D.Pa.1997).

5. In addition, § 553.104(b), which provides an illustrative list of work that qualifies under the volunteer definition, is explicitly made subject to the provision that services are performed on a volunteer basis only "when so motivated." *Rodriguez*, 866 F.Supp. at 1019 (quoting 29 C.F.R. 553.104(b)).

In *Rodriguez*, the court concluded that an unpaid patrol officer was an "employee" of the defendant municipality rather than a "volunteer" for purposes of the exemption from the minimum wage provisions of the FLSA. *Rodriguez*, 866 F.Supp. 1012. One of the critical factors in the court's decision was its finding that the plaintiff patrol officer did not perform the services in question for "civic, charitable, or humanitarian" reasons, but, rather, performed them in order to obtain additional employment as a road construction flagman in a neighboring county that required its flagmen to be police officers. *Id.* Thus, it appears that the plaintiff in *Rodriguez* had an underlying pecuniary motive for his patrol officer work.

With regard to pecuniary motive, the court in *Krause* concluded that firefighters were "employees" of the fire district rather than volunteers based on the fact that the firefighters expected compensation. *Krause,* 969 F.Supp. at 277. The court was persuaded by the fact that the plaintiffs received compensation at a minimum rate of $5.05 per hour and a maximum rate of $9.00 per hour for approximately a year and one-half before the fire district decided to return the firefighters to their previous volunteer status. *Id.* The court held that once the firefighters became employees, in that they received compensation that was more than a nominal fee for an extended period of time, the firefighters were prohibited from volunteering the same type of services to the same employer. *Id.* This was in large part due to the fact that the firefighters expected compensation for their services because they were paid employees at one time. *Id.*

In the case at hand, almost all of the plaintiffs have explicitly stated that they were motivated to join the rescue squads not for career enhancement, promotion, or pecuniary gain, but for the altruistic, humanitarian purpose of helping the citizens of the City. According to Benshoff, his motivation for joining the Blackwater Squad concerned "moral issues ... I could not sit back and watch somebody suffer while I had the training to take care of that ... [a service I could perform] from the fire apparatus when I was working." Benshoff Dep. at 29. Benshoff

also stated that he did not become a rescue squad member for career enhancement or promotion, but because it would "make me feel better." *Id.* at 30. According to Criswell, his motivation for becoming a rescue squad member was "[t]o make me initially more marketable to get hired with the paid fire department and to provide service to the citizens." Criswell Dep. at 59. Criswell, unlike Benshoff, was partially motivated by career enhancement. After Criswell got hired as a paid firefighter with the City, he resigned from the Courthouse Squad. However, he then joined Ocean Park Squad. When asked whether he would continue as a rescue squad member if he knew he would not get paid, Criswell responded "I would feel I would have no choice because of the moral issues that I have to provide the level of training that I have been trained to .... The citizens would suffer." *Id.* At 60–61. Thus, his motivation for joining the Ocean Park Squad and remaining a member of that squad is purely humanitarian since he had already obtained a paid position as a firefighter.

Floyd states that his motivation for joining the rescue squad was because "I noticed when I would respond on fire response down here that there was a need for ALS more so down here because we're [located] in the rural part of the [county] ... and I felt that I could better my career and help the people of—citizens of Virginia Beach to go on and get ALS care so I could render that to them off the fire truck." Floyd Dep. at 85. When asked what motivated him to become a member of the rescue squad, Marshall stated that he wanted to "[m]aintain my skills ... [a]ll my friends were members ... [t]here were not a lot of ALS providers when I first came in. So it was a—to help out." Marshall Dep. at 108–09. Marshall also declared that he thought joining the rescue squad would hinder rather than enhance his firefighting career "[b]ecause we fall into a grey area between the two departments. I never expected it to do anything for me other than to be able to help out people." *Id.* at 109. Marshall claims he had no expectation of being paid for his work with the rescue squad until he heard that the City was possi-

bly violating the Fair Labor Standards Act ("FLSA"). *Id.*

Nichols' reasons for joining the rescue squad were because "too many times [I was] on a scene [that] needed a paramedic and there just wasn't one there." Nichols Dep. at 17. Nichols went on to explain that he did not expect to get paid when he volunteered for the rescue squad, that firefighters were not required to provide advance life saving service, and he did not think being a rescue squad member would be good for his career, but "good for the citizens." Nichols Dep. at 46–48. When asked why he joined the rescue squad, Taylor stated that "I was approached by [rescue squad] members there because obviously working on the fire side, the EMS side is right there. They were having problems manning their ambulances. So he asked me if I would join to give them a hand." Taylor Dep. at 18. Walter's motivation for becoming a rescue squad member was because he "like[d] knowledge; and it just gave [him] more chance to do stuff and [gave him] more knowledge." Walters Dep. at 15. Walters also stated that when he first volunteered for the rescue squad, he did not expect to get paid for the time that he spent as a volunteer. Walters Dep. at 49. In addition, unlike the firefighters in *Krause,* the plaintiffs in this action have never received payment for their work as rescue squad members.

Because the plaintiffs are primarily motivated by civic, charitable, and humanitarian reasons and did not become rescue squad members with the expectation of compensation for services rendered, both requirements necessary to be classified as "volunteers" have been satisfied.

In addition to the subjective motivation of the worker, the *Rodriguez* court also looked at the municipality's view toward the worker's status. The court held that work does not qualify as "volunteer" where only one party understands the work to be voluntary. In other words, in addition to the worker, the organization for which the worker provides services must also have the understanding that the work is performed on a volunteer basis. *Rodriguez,* 866 F.Supp. at 1019. "Individuals shall be considered volunteers only where their services are offered freely and without coercion, direct or implied, from an employer." 29 C.F.R. § 553.101(c).

The court in *Rodriguez* observed that: (1) the municipality hired Rodriguez as a full-time, though unpaid, patrol officer after it disbanded its former practice of using part-time deputy marshals who worked in an auxiliary-type police force to provide security for the town; (2) the personnel manual that the patrol officers had to follow referred to the patrol officers as "employees" of the town, and included a provision whereby the municipality could require the patrol officers to give up any outside employment that interfered with the individual's work for the municipality; and (3) the municipality was entrusted with the "hiring and firing" of its patrol officers. *Id.* at 1020. These factors, in addition to the requirement that patrol officers complete an "employment" application, lead to court to conclude that the municipality never contemplated a "volunteer" organization when it created the town's police department. *Id.* The court observed that the explicit use of language commonly associated with an ordinary employment relationship also negated the idea that the municipality viewed the firefighters as volunteers.

Unlike the municipality in *Rodriguez,* the City utilizes rescue squad members as part-time workers through independent, privately-organized, auxiliary-like rescue squads. Second, the City's operational manual that governs the conduct of rescue squad members in their capacity as DEMS members does not require rescue squad members to give up outside employment that interferes with their rescue squad work. Third, the City is not ultimately responsible for the approval and dismissal of rescue squad members. Instead, that power is vested in the individual rescue squads themselves. The City does have some disciplinary powers over rescue squad members to the extent that these members are DEMS members. However, discipline is described in terms of "reprimand, suspension, and dismissal", not "hiring and firing". In fact, the City ordinances, DEMS application form, DEMS Personnel Handbook, and various other rescue squad related documents all refer to the rescue

squad workers as "members" not "employees" and use language that deemphasizes the ordinary employment relationship.[6] Thus, it is obvious that the City does not hold the rescue squad members out as "employees."

Besides outlining specific requirements for volunteerism, Congress also sought to establish a balance between encouraging volunteerism in public service and discouraging coercion or undue pressure upon individuals to volunteer their time. As noted in the regulations pertaining to volunteerism,

> Congress did not intend to discourage or impede volunteer activities undertaken for civic, charitable, or humanitarian purposes, but expressed its wish to prevent any manipulation or abuse of minimum wage or overtime requirements through coercion or undue pressure upon individuals to volunteer their services.

29 C.F.R. § 553.101(b). The Court notes that there is no evidence of coercion or undue pressure by the City upon the plaintiffs to volunteer their services. In fact, the opposite appears to be true. The plaintiffs volunteered their services to the private rescue squads, from all appearances before they had any thought of compensation for their work. Stripping away the thin veneer of righteous expectation, the Court can only rationally conclude that the plaintiffs are not victims of undue pressure to volunteer. The oddity is that in order to remain qualified, a member of a rescue squad must perform a minimum number of hours per month, either 12 or 24, depending upon the member's classification. The City cannot discriminate against the plaintiff volunteers by declining to allow them to serve as rescue squad members. In essence, it would be the plaintiffs who would control their capacity to volunteer hours, and the City could not discriminate against them by denying them the right to "volunteer". If they no longer wish to be volunteers, the plaintiffs need only resign from the rescue squads and limit their activities to their regular shifts as firefighters, which in no way hinders them. This Court will not allow firefighters seeking time and one-half their

regular pay for volunteer work to eviscerate the spirit of volunteerism that has characterized the rescue squads of the former Princess Anne County and now the City for over 50 years. Therefore, Count I and Count II of the Complaint against the City are hereby DISMISSED.

Accordingly, defendant's motion for summary judgment is hereby GRANTED and plaintiff's motion for partial summary judgment is hereby DENIED.

The Clerk of the Court is REQUESTED to mail a copy of this Order to all counsel of record. IT IS SO ORDERED.

---

**6.** For example, several DEMS documents, such as the DEMS Recruitment Handbook, refer to rescue squad workers as "VOLUNTEER RESCUE SQUAD MEMBER." DEMS Recruitment Handbook at 1 (emphasis in original).