**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES PURDHAM, For himself and
all similarly situated employees of
Defendant,

   *Plaintiff-Appellant,*

   and

MICHAEL BOUCHARD, For himself
and all similarly situated
employees of Defendant; FLOYD
WILLIAMS, For himself and all
similarly situated employees of
Defendant,

   *Plaintiffs,*

   v.

FAIRFAX COUNTY SCHOOL BOARD,

   *Defendant-Appellee,*

   and

FAIRFAX COUNTY PUBLIC SCHOOLS,

   *Defendant.*

No. 10-1048

NATIONAL SCHOOL BOARDS
ASSOCIATION; NORTH CAROLINA
SCHOOL BOARDS ASSOCIATION;
SOUTH CAROLINA SCHOOL BOARDS
ASSOCIATION; VIRGINIA SCHOOL
BOARDS ASSOCIATION,

   *Amici Supporting Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Liam O'Grady, District Judge.
(1:09-cv-00050-LO-TRJ)

Argued: December 9, 2010

Decided: March 10, 2011

Before Sandra Day O'CONNOR, Associate Justice
(Retired), Supreme Court of the United States, sitting by
designation, and KING and DAVIS, Circuit Judges.

---

Affirmed by published opinion. Judge Davis wrote the opinion, in which Justice O'Connor and Judge King joined.

---

**COUNSEL**

**ARGUED:** Nils George Peterson, Jr., Arlington, Virginia, for Appellant. Thomas Patrick Murphy, HUNTON & WILLIAMS, LLP, McLean, Virginia, for Appellee. **ON BRIEF:** Jeffrey B. Hardie, HUNTON & WILLIAMS, LLP, McLean, Virginia, for Appellee. Francisco M. Negron, Jr., General Counsel, Lisa E. Soronen, Nancy Dinsmore, NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia, for Amici Supporting Appellee.

---

**OPINION**

DAVIS, Circuit Judge:

Appellant James Purdham is employed as a safety and security assistant by the Fairfax County, Virginia, School

Board. Purdham filed this action asserting that the School Board failed to pay him overtime wages for his services as the coach of a high school golf team, and thereby violated the Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. § 201 *et seq*. After the close of discovery, the district court granted the School Board's motion for summary judgment. Whether Purdham is owed overtime wages hinges on whether, as a golf coach, he is to be deemed an "employee" or a "volunteer" within the meaning of the FLSA. We hold, for the reasons set forth within, that the School Board properly deemed Purdham a volunteer. Accordingly, we affirm the judgment of the district court.

I.

A.

For approximately twenty years, Purdham has worked as a safety and security assistant for the Fairfax County Public Schools. Purdham's security duties include monitoring the school building, assisting in investigations, and monitoring the arrival and departure of school buses. In addition to his regular full-time position, Purdham has served for the past fifteen years as Hayfield Secondary School's golf coach. Purdham's position as a security assistant is not conditioned on his coaching activities, and he is free to relinquish his coaching duties at any time without an adverse impact on his full-time security position.

As part of his coaching services, Purdham maintains a varsity golf squad of twelve to sixteen students in addition to a "B Squad" of several students. Purdham maintains the latter group in order to avoid excluding students who are interested in the sport but who do not make the varsity squad. The golf season begins the first week of August and runs through November. After tryouts, the regular competitive season includes eight to ten golf competitions in addition to daily practices. At the end of the regular season, the team partici-

pates in several tournaments. For all golf activities, Purdham transports players to and from the golf course, and he occasionally drives them to their homes.

In addition to his coaching duties during the regular season, Purdham also: schedules the upcoming season; responds to telephone calls, e-mails, and text messages from parents and players; arranges the golf team finances; holds an annual interest meeting for prospective players; arranges for the team to complete a community service project; and oversees the team's fundraising activities. Purdham estimates that he spends 400 to 450 hours annually on golf coaching activities.[1] The School Board permits Purdham to work on coaching activities during his regular work day. In addition, when the golf team has a tournament or activity that occurs during Purdham's normal working hours, the School Board permits him and other coaches to use paid administrative leave while he is away from his regular duties.

Purdham receives reimbursement for his expenses, including a mileage allowance, for his coaching activities. Purdham also receives a stipend from the School Board in consideration for his services as a coach. The School Board's stipend policy mirrors that of other school systems in close proximity to Fairfax County. When Purdham first began coaching, more than a decade before filing suit, his stipend was between $500 and $800. More recently, Purdham's stipend had increased to $2,114 for the 2008-09 school year (and slightly less than that for the 2007-08 school year). The stipends for all coaches of a particular sport are the same, regardless of how many hours each coach devotes to coaching activities and regardless of a

---

[1]Somewhat inconsistently, Purdham has also stated that he spends closer to 300 hours annually on golf coaching activities. Yet on another occasion, Purdham stated that his "best guess" as to the number of hours he spends coaching the golf team was reflected in an exhibit he prepared that shows he spent 349 hours on golf coaching activities from July 12, 2008 through October 17, 2008.

team's performance. The majority of the Fairfax County coaches are (like Purdham) regular employees of the School Board. The most common regular position among golf coaches was as a health and physical education teacher. The record shows that the full-time salaries among this group ranged from $30,191 to $90,076.

If a coach decides to relinquish his or her position and a replacement is needed, the replacement coach will receive the same stipend that the predecessor received. That is, the School Board does not negotiate with prospective coaches regarding the stipend. Under School Board policy, if a coach is terminated during the season and disputes the termination, the coach is entitled to file a grievance.

### B.

Purdham's claims rest significantly on the fact that for a brief period, the School Board in fact paid its coaches overtime, but then it ceased paying overtime. In full context, however, as we explain below, the School Board's brief deviation from its longstanding practice of not paying overtime provides scant support for Purdham's claims.

From the time Purdham began coaching in the early 1990s until 2004, the School Board did not pay overtime wages to Purdham and other coaches. In 2004, however, the School Board learned of FLSA-related litigation against other school districts; accordingly, it conducted a wage-hour audit of similarly-situated schools in order to determine whether coaches were being managed correctly. As a result of its study, the School Board decided, out of "an abundance of caution," to pay non-exempt employees overtime wages based on a calculation of the hours they had devoted to coaching activities. Thus, Purdham and his peers received retroactive payments representing unpaid overtime for hours devoted to coaching activities for the 2003-2005 golf seasons. Also, as a result of the audit, the School Board issued contracts to

coaches for the 2005-2006 school year, providing that the coaches were to be paid $14 per hour and that they were entitled to time and a half in overtime wages.

Importantly, when the School Board determined to pay the coaches retroactive overtime and undertook to implement contractual arrangements with coaches, it also made a policy decision that, effective July 1, 2006, it would no longer permit non-exempt employees such as Purdham to coach or participate in supplemental or extra-curricular activities. This decision was based primarily if not solely on the potential complications associated with documenting coaches' hours. However, before the School Board implemented its new policy, the Department of Labor issued a guidance opinion letter about school coaching and FLSA compliance. Based on this new guidance from the Department of Labor, the School Board concluded that its full-time non-exempt employees were properly deemed "volunteers" in connection with their coaching activities and thus not eligible for overtime compensation. As a result, the School Board abandoned its policy of prohibiting non-exempt employees from coaching. This change in policy was communicated in a letter to all principals on June 13, 2006. In June 2007, the School Board informed Purdham of the Department of Labor guidance letter and that the School Board would not pay overtime wages to full-time employees who "volunteer" to coach.

## C.

Purdham filed this action pursuant to the FLSA against the School Board in the United States District Court for the Eastern District of Virginia as a proposed collective action on behalf of himself and all other School Board employees who are both (1) regular employees not exempt from the minimum wage and overtime requirements of the FLSA, and (2) also serving separately as coaches of school athletics or as directors of other extracurricular activities.[2] After the district court

---

[2]Purdham also brought claims for wages related to his taking of tickets at school athletic events and alleged off-the-clock work as a security offi-

denied Purdham's motion for conditional certification of the case as a collective action, *see Purdham v. Fairfax County Pub. Sch.*, 629 F. Supp. 2d 544 (E.D. Va. 2009), and after the close of discovery, the parties filed cross-motions for summary judgment on the issue of whether Purdham should be deemed an "employee" within the meaning of the FLSA in connection with his services as a golf coach.

After hearing oral argument, the district court granted the School Board's motion for summary judgment, denied Purdham's cross-motion, and held that Purdham was not to be deemed an "employee" with respect to his services as the coach of the golf team but instead, was to be deemed a "volunteer." The court reasoned that Purdham was a volunteer because Purdham was not doing the same type of work as required by his regular position as a security assistant and because the stipend he received was a "nominal fee" authorized by law to be paid to volunteers. Purdham noted a timely appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review the grant of summary judgment *de novo*. *See Canal Ins. Co. v. Distribution Servs., Inc.*, 320 F.3d 488, 491 (4th Cir. 2003); *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002). Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, "no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

cer. Those claims have been dismissed and are not part of the present appeal. Additionally, the similar claims of two other named plaintiffs have been dismissed and are not part of the present appeal.

III.

A.

The FLSA generally requires that all covered employers compensate their employees at the rate of one and one-half times their normal hourly rate for all hours worked in excess of a forty-hour week. *See* 29 U.S.C. § 207(a)(1). The Act is "remedial and humanitarian in purpose," and is meant to protect "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944). The FLSA should be broadly interpreted and applied to effectuate its goals. *See Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 296 (1985).

Individuals seeking compensation pursuant to the FLSA "bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act." *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999). However, the Supreme Court has cautioned that the FLSA "must not be interpreted or applied in a narrow, grudging manner," *Tennessee Coal*, 321 U.S. at 597, and that exemptions from FLSA coverage "are to be narrowly construed against the employers seeking to assert them," *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

Under the FLSA, "'employ' [means] to suffer or permit to work." 29 U.S.C. § 203(g). To be sure, this definition was "not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another," nor should it be interpreted so as to "sweep under the Act each person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, work[s] in activities carried on by other persons either for their pleasure

or profit." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947). For example, if an individual is a "volunteer" instead of an "employee," Congress created an exemption to the FLSA's coverage applicable in the public employment context. In particular, Congress provided that "any individual who volunteers to perform services for a public agency" is exempt from FLSA coverage if:

> (i) the individual receives no compensation or is paid expenses, reasonable benefits, or a nominal fee to perform the services for which the individual volunteered; and (ii) such services are not the same type of services which the individual is employed to perform for such public agency.

29 U.S.C. § 203(e)(4)(A). Thus, where a public employee engages in services different from those he or she is normally employed to perform, and receives "no compensation," or only a "nominal fee," such work is exempt from the FLSA and the public employee is deemed a volunteer.

The FLSA does not itself define "volunteer," but pursuant to a Department of Labor regulation promulgated under the FLSA, a "volunteer" is an "individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered." 29 C.F.R. § 553.101(a). At the same time, "[v]olunteers may be paid expenses, reasonable benefits, a nominal fee, or any combination thereof, for their service without losing their status as volunteers." 29 C.F.R. § 553.106(a). It is critical that the facts show the volunteer offers his or her services "freely and without pressure or coercion, direct or implied, from an employer." 29 C.F.R. § 553.101(c). Finally, an individual may not be deemed a "volunteer" if the individual is "otherwise employed by the same public agency to perform the same type of services as those for which the individual proposes to volunteer." 29 C.F.R. § 553.101(d). This latter provision reflects the unmis-

takable intention of the Department of Labor (and no doubt of Congress) to prohibit "any manipulation or abuse of minimum wage or overtime requirements through coercion or undue pressure upon individuals to 'volunteer' their services." 29 C.F.R. § 553.101(b).

The regulatory definition of volunteer should be applied "in a common-sense manner, which takes into account the totality of the circumstances surrounding the relationship between the individual providing services and the entity for which the services are provided." *Cleveland v. City of Elmendorf*, 388 F.3d 522, 528 (5th Cir. 2004). Finally, the question of whether an individual is a volunteer is a matter of law to be determined by the court. *See Castillo v. Givens*, 704 F.2d 181, 185 (5th Cir. 1983), *cert. denied*, 464 U.S. 850 (1983). Accordingly, we review "the objective facts surrounding the services performed to determine whether the totality of the circumstances" establish volunteer status, *City of Elmendorf*, 388 F.3d at 528, or whether, instead, the facts and circumstances, objectively viewed, are rationally indicative of employee status.

B.

With these principles in mind, we examine the plaintiff's assertion that, with respect to his service as golf coach, he must be deemed an "employee" entitled to overtime pay under the FLSA. First, Purdham states that because he never considered himself to be a volunteer, he is an employee. Second, Purdham states that he is an employee pursuant to his "employment contract" and Virginia law. Third, Purdham states that the School Board's retroactive payment of overtime wages for 2003-2005 precludes the School Board's deeming him a volunteer. Fourth, Purdham states that he is an employee under the Act because the School Board pays him for the same type of services he performs as a security assistant when he engages in coaching activities and because the School Board grants Purdham paid administrative leave dur-

ing the regular work day for coaching activities. Finally, Purdham states that he is paid more than a "nominal fee" for his coaching services, thereby precluding volunteer status under the FLSA. We examine these contentions in turn and find, consistent with the district court's analysis, they do not substantially support the conclusion that Purdham should be deemed an employee with respect to his services as the golf coach.

1.

Purdham first asserts that he never intended to volunteer as a golf coach, and therefore, should not be classified as a volunteer. However, the determination of whether an individual is an employee or a volunteer under the FLSA is a question of law. Consequently, we look at the objective facts surrounding the services performed to determine whether the totality of the circumstances supports a holding that, under the statute and under the Department of Labor's implementing regulations, Purdham is most appropriately deemed a volunteer. *See City of Elmendorf*, 388 F.3d at 528.

Here, Purdham became the coach of the golf team when the director of athletics asked him if he would be interested in the position. Purdham was never coerced or pressured into becoming a coach and his employment as a security assistant is not dependent on his coaching; he is free to relinquish his role as coach at anytime without fear that doing so will have any impact on his full-time employment.

The fact that Purdham may be motivated, in part, by his stipend does not substantially support his claim to employee status under the FLSA. The Supreme Court has defined a volunteer as "an individual who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, work[s] in activities carried on by other persons either for their pleasure or profit." *Alamo*, 471 U.S. at 295. Understandably, Purdham emphasizes the Court's use of the

term "solely," but the Department of Labor regulation at 29 C.F.R. § 553.101 was promulgated after the *Alamo* decision, and omits any requirement that the motivation be "solely" for personal purpose. Consequently, the "regulatory definition does not require that the individual be exclusively, or even predominantly, motivated by civic, charitable, or humanitarian reasons." *Todaro v. Township of Union*, 40 F. Supp. 2d 226, 230 (D.N.J. 1999). Rather, what is required is that the individual must be motivated by civic, charitable or humanitarian reasons, at least in part. *See id.*

Viewed objectively, this case presents a classic example of an individual who is motivated, in significant part, by humanitarian and charitable instincts. Purdham is motivated by his long-standing love of golf and his dedication to his student athletes. He prefers coaching over obtaining a part-time job because it is a "lifestyle choice" to coach; coaching young golfers provides him with "satisfaction." J.A. 117-21. He created a "B squad" because he "hate[s] cutting kids" from the golf program and has the "philosophy" that "it's not costing [the school] anything" to get more students interested in golf. Finally, he enjoys coaching because golf is "a sport of a lifetime." J.A. 74-75.

Also relevant to the objective, totality of the circumstances analysis is how other coaches view coaching positions. It is the culture of high school athletics for the coaches to consider themselves volunteers. The School Board submitted to the district court the declarations of eighteen high school coaches who consider themselves volunteers. *Cf. Isaacson v. Penn Community Services*, 450 F.2d 1306, 1309 (4th Cir. 1971) ("Particularly in the case of . . . hospitals, museums and schools, the role of the volunteer is not unknown."). Consequently, we have no hesitation in concluding that, despite Purdham's mixed motivations, the record amply supports the conclusion that Purdham "volunteered" to serve as the golf coach within the contemplation of the FLSA. The fact that he is motivated in part by receipt of his stipend (or expense reim-

bursements) does not significantly bolster his assertion that he is to be treated as an employee for the services he provides as a coach.

### 2.

We next examine Purdham's assertion that pursuant to his "employment contract," he should be treated as an employee. Initially, we note that the terms the parties use are not controlling when we inquire whether an individual is an employee or a volunteer under the FLSA. *See Walling*, 330 U.S. at 151 ("[I]n determining who are 'employees' under the Act, common law employee categories or employer-employee classifications under other statutes are not of controlling significance."). Rather, the court's inquiry is whether, in light of the statutory and regulatory indicia underlying the FLSA, an individual is an employee.

Purdham also relies on the Virginia Government Volunteers Act, which defines a volunteer as an individual who freely provides goods or services to a state or local agency "without any financial gain." Va. Code § 2.2-3601. This argument is without merit. The FLSA expressly provides that public entities are authorized to remit to volunteers a "nominal" fee, "benefits," and reasonable expenses. As such, we conclude that neither the parties' descriptive terms nor the definition of a volunteer under state law controls the determination of whether an individual is appropriately deemed a volunteer under the FLSA.

### 3.

We next turn to Purdham's contention that because the School Board paid him retroactive overtime, he should be deemed an employee. Purdham also asserts, relatedly, that after the School Board paid him the retroactive overtime, it improperly converted all coaches to volunteer status. To support these contentions, Purdham relies on *Krause v. Cherry*

*Hill Fire Dist. 13*, 969 F.Supp. 270, 272 (D.N.J. 1997). In *Krause*, a fire district relied on both career firefighters and non-career firefighters. The career firefighters received compensation pursuant to a collective bargaining agreement. *Id.* The non-career firefighters were not covered by the agreement and were compensated at a rate of $8.00 per hour for day shifts and $5.05 per hour for overnight shifts. *Id.* After nineteen months, the fire district restructured the department and began paying the non-career firefighters a flat rate of $20.00 per eight-hour shift. *Id.* As a result, some of the non-career firefighters, who had been earning $8.00 per hour, would only earn $20 per shift. *Id.*

The *Krause* court determined that the fire district could not restructure the positions so that once-compensated firefighters were converted into volunteers. *Id.* at 278. The court reasoned that the FLSA forbids such a reclassification because it "flies in the face of the specific provision of the regulations which state that: 'An individual shall not be considered a volunteer if the individual is otherwise employed by the same public agency to perform the same type of services as those for which the individual proposes to volunteer.'" *Id.* (citing 29 C.F.R. § 553.101(d)). The court reasoned that having "gone to these lengths to protect employees, ultimately even from themselves, it is unlikely that Congress intended to permit employers to change unilaterally an employee's status to that of a volunteer." *Id.*

Here, Purdham's situation as an athletic coach is clearly distinguishable from the situation of the firefighters in *Krause*. First, prior to the payment of overtime for the 2003-2005 golf seasons, Purdham never received overtime pay in addition to his stipend for the ten years he previously coached golf. In contrast, the fire district in *Krause* initiated its relationship with the non-career firefighters as an employer-employee relationship. Second, the firefighters' only association with the fire district was as firefighters. In contrast, Purdham has a regular full-time job he performs for the School

Board as a security assistant. Third, Purdham's coaching hours have never affected his permanent employment.

Our conclusion is supported by the language and evident intent of the relevant statutory and regulatory provisions. The statute and regulations both are designed to discourage public employers from pressuring an employee to volunteer extra services in order to keep his or her job. In contrast, Purdham was never pressured to volunteer as a golf coach in order to maintain his employment with the School Board.

The School Board's change in policy is further explained by its effort to ensure compliance with the FLSA rather than any effort at improperly pressuring employees to work additional hours under the guise of volunteer status. From the time Purdham started coaching until 2004, the School Board did not pay overtime wages to coaches based on its understanding of then-current Department of Labor guidance. Purdham received overtime pay for his coaching services for the 2003-2005 golf seasons out of "an abundance of caution" because of lawsuits naming other school districts. As a result of this understanding, the School Board announced that effective July 1, 2006, it no longer would permit non-exempt employees such as Purdham to coach or participate in other supplemental or extra-curricular activities. However, before this plan was implemented, an updated Department of Labor guidance letter notified the School Board that non-exempt employees who are volunteers can continue to coach and receive a nominal stipend.

The School Board's conduct in attempting to remain in compliance with federal law is wholly unlike the conduct of the fire district in *Krause*. Additionally, the Department of Labor has recognized that the *Krause* holding is not appropriate in all situations. In a 2006 guidance letter, the Department of Labor addressed a situation where a city council member was hired by the city as a firefighter. DOL Wage-Hour Op. Ltr. July 24, 2006. The city sued the individual for state con-

flict of interest violations stemming from the fact that he was both a city council member and, as a firefighter, a city employee. To settle the litigation, the council member agreed to terminate his firefighter "employment" but he wanted to continue as a non-paid volunteer firefighter. The guidance letter focused its inquiry on whether the council member was coerced into volunteering "in order to retain his position as City Council member." DOL Wage-Hour Op. Ltr. July 24, 2006. The letter concluded that there was no evidence of coercion because there was "no evidence that he was obliged or even encouraged to volunteer as a firefighter in order to retain his position either as City Council member or mayor." *Id.* Similarly here, the School Board did not coerce Purdham into volunteering in order to retain his security position.

In sum, neither in its proactive decision to pay overtime wages to coaches in Purdham's classification, nor in its sudden change in policy in the face of evolving legal standards as clarified by the federal agency charged with enforcing the Act, has the School Board fatally deviated from its longtime view that coaches should be treated as volunteers. Purdham's attempt to leverage those changes into support for his claims is unavailing.

4.

Next, Purdham seems to suggest that he is paid for the same type of services he provides the School Board as a security assistant as he provides as a golf coach. In particular, Purdham contends that the School Board recognizes the interrelationship between his duties as a security assistant and his services as a golf team coach by allowing Purdham paid administrative leave from his day job when a golf event occurs during the school day.

Purdham bases this claim on several Wage and Hour Division guidance letters. In a 2006 guidance letter, for example, the Department of Labor addressed whether a government-

employed mechanic who volunteers as a firefighter can be provided paid administrative leave while he responds to emergency calls as a firefighter. DOL Wage-Hour Op. Ltr. August 7, 2006. The letter opined that because the agency paid the individual his regular wages while allowing him to use paid administrative leave during the workday to respond to fire emergencies, the agency risked converting his status as a volunteer firefighter into an employee for all of the time he spent providing services as a firefighter. According to the letter, in order for the individual to avoid "jeopardiz[ing]" his status as a volunteer firefighter, the employer would need to charge his time responding to calls during the regular workday to personal leave, i.e., leave time available to the mechanic that he could use however he wished.[3] *Id.*

We find this conclusory opinion does not aid Purdham in this case. We recognize "that opinion letters of the Department of Labor are generally accorded some deference." *Benshoff*, 180 F.3d at 149 n.11. However, when in the context of a particular case, the guidance is "contrary to the plain language of [the statute] and inject[s] considerations which are neither called for by the section nor consistent with its purposes," we are obliged to reject them. *Id.* Here, § 203(e)(4)(A) was "enacted as an amendment to the FLSA in 1985 in order to exempt from the definition of 'employee,' and consequently from the FLSA pay requirements, those individuals who volunteer services to governmental entities." *Id.* at 147; *see also* S. Rep. No. 99-159, at 10 (1985) ("The committee does not intend to discourage or impede volunteer activities undertaken for humanitarian purposes. At the same time, the committee wishes to prevent any manipulation or abuse of minimum wage requirements through coercion or undue pressure upon employees to 'volunteer.'"). We find that a blanket prohibition on the provision of paid administrative leave to volunteers is inconsistent with the statutory goals.

---

[3]This conclusion reiterates a similar finding in an April 14, 2003 guidance letter.

Regular full-time school employees who elect to coach athletics are clearly distinguishable from full-time government-employed mechanics who provide services as volunteer firefighters. Without question, fire emergencies can and do occur at anytime of the day or night. Thus, it would be possible for a government-employed mechanic to schedule his volunteer activities in such a way as not to conflict with his full-time employment. If a government employer chooses to release the erstwhile volunteer firefighter to respond to emergencies during the regular work day, there may be a risk of overreaching to the detriment of the employee.

On the other hand, school athletics most often require a coach, particularly of a sport requiring daylight, to "volunteer" during the school day. For example, if a sports team has an away game, it is necessary for the coach to be able to leave the school campus before the end of the school day in order to properly supervise the team and manage the team's participation in interscholastic contests.

Manifestly, the rigid prohibition of paid administrative leave provided for in the guidance letters is contrary to Congress's intent not to discourage or impede volunteer activities. Under the guidance letters' interpretation, school employees would have only impractical options if they wanted to volunteer to coach: (1) they could use personal leave or (2) take unpaid leave. Under the guidance letters' rationale, it would be highly impractical to volunteer and hence would *discourage* school employees from volunteering, in direct conflict with the goals of Congress in enacting § 203(e)(4)(A).

Similarly, Purdham contends that he must be deemed an employee because coaches are permitted to use the school system's grievance procedure and because the School Board makes deductions from his stipend for taxes and to place funds into a retirement fund. Neither of these contentions is persuasive. Access to a grievance procedure has no bearing on the voluntariness determination. In addition, the record does

not support Purdham's retirement deduction contention. The only person who testified about the retirement fund issue, Kevin North, was not the designated witness for the subject matter. Nevertheless, even if retirement deductions were taken from Purdham's stipend, the Act and its implementing regulations expressly permit provision of reasonable benefits to volunteers, *see* 29 U.S.C. § 203(e)(4)(A)(i); 29 C.F.R. 553.106(d), and we discern no good reason to regard such an indirect benefit as enhanced retirement benefits based on a percentage of the stipend as outside this authority.

5.

Finally, we turn to Purdham's contention that his coaching stipend is more than the "nominal fee" permitted by law. Individuals do not lose their volunteer status if they receive a "nominal fee" from a public agency. 29 C.F.R. § 553.106(a). A nominal fee "is not a substitute for compensation and must not be tied to productivity." 29 C.F.R. § 553.106(e). The Department of Labor offers the following guidance:

> The following factors will be among those examined in determining whether a given amount is nominal: The distance traveled and the time and effort expended by the volunteer; whether the volunteer has agreed to be available around-the-clock or only during certain specified time periods; and whether the volunteer provides services as needed or throughout the year. An individual who volunteers to provide periodic services on a year-round basis may receive a nominal monthly or annual stipend or fee without losing volunteer status.

29 C.F.R. § 553.106(e). The regulation concludes by stating that the nominal fee inquiry should be made by examining "the total amount of payments made . . . in the context of the economic realities of the particular situation." 29 C.F.R. § 553.106(f).

The "economic realities" language in § 553.106(f) is derived from the "economic realities test" that has been used in determining whether an individual is an employee or an independent contractor. *See, e.g.*, *Garrett v. Phillips Mills*, 721 F.2d 979 (4th Cir. 1983) ("[W]hether an individual is an employee . . . is properly determined by analyzing the facts of each employment relationship under a standard that incorporates both the common law test derived from principles of agency and the so-called 'economic realities' test first announced in *Bartels v. Birmingham*, 332 U.S. 126 (1947)."). In *Bartels*, the Supreme Court stated that "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Bartels*, 332 U.S. at 130.

Other courts have looked to the economic realities test in the FLSA context in determining whether an individual is an employee or a volunteer. *See, e.g.*, *Rodriguez v. Township of Holiday Lakes*, 866 F.Supp. 1012, 1017 (S.D. Tex. 1994). However, they have concluded that the test "is best suited to determine whether, as a matter of economic reality, an individual is in business for himself or herself as an independent contractor, or is an employee of another." *Krause*, 969 F. Supp. at 274-75; *Cleveland v. City of Elmendorf*, 2004 WL 305609 (W.D. Tex Jan. 23, 2004), *aff'd*, 388 F.3d 522 (5th Cir. 2004). As a result, the economic realities test "is of limited utility in determining whether an individual is an 'employee,' as opposed to a 'volunteer.'" *Krause*, 969 F. Supp. at 274-75; *see also Rodriguez*, 866 F. Supp. at 1020 ("[T]he 'economic reality test' is inapplicable in trying to distinguish an employee from a volunteer where no payments at all are made between the parties."); *Todaro*, 27 F. Supp. 2d at 534-35 (economic realities test "is not as useful when attempting to distinguish volunteers from employees, where there is no economic relation to measure.").

Upon careful consideration of all of the circumstances surrounding Purdham's stipend, we are not persuaded that the

stipend substantially supports plaintiff's claim to employee status. Our conclusion is in accord with the regulations promulgated under the FLSA. The regulations provide that a nominal fee should (1) not be a "substitute for compensation"; (2) "must not be tied to productivity"; and (3) "should be examined by the total amount of payments made . . . in the context of the economic realities of the particular situation." *See* 29 C.F.R. §§ 553.106(e)-(f).[4]

Here, Purdham's two most recent coaching stipends were $2,114 and $2,073. The School Board pays a fixed stipend amount regardless of an individual's time and effort. Coaches are free to spend as much, or as little, time as they choose on coaching activities such as clinics, scheduling offseason activities, try-outs, and reviewing player performances; the stipend amount will not change. Accordingly, as a matter of law, the stipend does not "compensate" for services rendered. In addition, the stipend is not tied to productivity. The School Board does not pay a coach more for a team's successful performance or any less where success is not achieved.

Furthermore, Purdham likely receives less than the federally-mandated minimum wage for his coaching activities. Initially, Purdham stated that he spends 400 to 450 hours annually on golf coach activities. He later stated that he spent closer to 300 hours annually. Later, he stated that he spent 349 hours in the golf season, excluding off-season hours, on golf coaching activities. As a result, the average figure Purd-

---

[4]The other factors enumerated in 29 C.F.R. § 553.106(e) address "payment of a nominal amount on a 'per call' or similar basis to volunteer firefighters." In those situations, the regulation provides that the "following factors will be among those examined in determining whether a given amount is nominal: The distance traveled and the time and effort expended by the volunteer; whether the volunteer has agreed to be available around-the-clock or only during certain specified time periods; and whether the volunteer provides services as needed or throughout the year . . . ." We conclude that these factors are inapplicable in the athletic coach setting.

ham gave is between 350 to 400 hours.[5] Even assuming he only worked 350 hours, the result is that Purdham was paid $6.05 per hour in 2008 and $5.90 per hour in 2007. While the 2008 rate is five cents above the minimum wage, both of these figures are considerably less than the $25.69 per hour he is paid for his regular employment as a security assistant. Therefore, we conclude that Purdham is not being paid a salary for his services as a golf coach. Instead, the stipend Purdham receives is a "nominal fee" as permitted for volunteers under the FLSA.

## IV.

In summary, we conclude that as a matter of law, under an objective view of the totality of the circumstances, the School Board correctly rejected Purdham's claim to employee status during the time he spends coaching the golf team. Accordingly, we affirm the district court's judgment.

*AFFIRMED*

---

[5]Purdham points the court to a witness who stated that a golf coach would spend "about 200 hours reasonably" coaching during the golf season. J.A. 722-23. Similarly, another witness stated that when he was a swimming coach, his range of hours was 150 to 175. J.A. 745-47. Neither of these estimates is an accurate accounting for the number of hours Purdham spends in coaching golf. At bottom, we find unpersuasive Purdham's lowered estimates of the time he spends on coaching activities in an effort to have us treat the stipend as approximating an hourly wage that meets the federally-mandated minimum wage.